The CONE CORPORATION, C.H. Barco Contracting Co., Asphalt Pavers, Inc., etc., et al., Plaintiffs–Appellants,

v.

FLORIDA DEPARTMENT OF TRANSPORTATION, Ben G. Watts, Secretary of the Department of Transportation; and Bob Martinez, Governor of the State of Florida, Defendants–Appellees.

No. 89–3694.

United States Court of Appeals,
Eleventh Circuit.

Jan. 8, 1991.

Harry F. Chiles, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants-appellees.

Before TJOFLAT, Chief Judge, ANDERSON and CLARK, Circuit Judges.

TJOFLAT, Chief Judge:

This is an appeal from an order of the district court declaring unconstitutional on fourteenth amendment equal protection grounds a Florida statute, Fla.Stat. § 339.0805 (1989), and the regulations promulgated thereunder, Fla.Admin.Code Ann. ch. 14–78 (1989), that created a set-aside and minority business participation program for contracts awarded by Florida's Secretary of Transportation (the Secretary), the head of the Florida Department of Transportation (FDOT).[1] In its order, the district court [2] noted that this statute and the regulations had been modeled after a nearly identical federal statute, the Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), Pub.L. No. 100–17, § 106(c), 101 Stat. 132, 145, and the regulations promulgated thereunder, 49 C.F.R. §§ 23.61–69 (1989), which require a state to have a set-aside and minority business participation program if it wants to receive federal funds for highway construction projects, and that the federal statute contained no equal protection infirmity under the fifth amendment. Concluding that the Florida statute and regulations are "the end result of, and thus necessarily a part of," a valid federal program, the court upheld the Florida stat-

Herbert P. Schlanger, Atlanta, Ga., for Cone Corp.

Robert B. Baker, Jr., Southeastern Legal Foundation, Inc., Atlanta, Ga., for O.B. Brooks et al.

1. We originally heard the case as an interlocutory appeal by the plaintiffs from the district court's order refusing to issue a preliminary injunction against the implementation of section 339.0805 and the regulations thereunder. At oral argument, both parties stated that the case was ready for a final decision by the district court. In the interests of judicial economy and to avoid a possible provisional decision by this court, we remanded the case to the district court for the entry of final judgment while retaining jurisdiction of the appeal. *Cone Corp. v. Florida Dep't of Transp.*, No. 89–3694 (11th Cir.

Nov. 16, 1989) (per curiam) (unpublished opinion).

2. The district court adopted, without modification, the report and recommendation of the magistrate, to whom it had referred the plaintiffs' application for preliminary injunctive relief and their motion for summary judgment, as its final order. All references herein to the findings of fact and conclusions of law of the district court are therefore to the findings and conclusions of the magistrate.

ute to the extent that it serves as a vehicle for obtaining federal highway construction funds. In sum, the district court concluded that Fla.Stat. § 339.0805 and the regulations promulgated thereunder are, at once, both constitutional and unconstitutional on their face—depending on the source of the funds that the Secretary may be using to implement the program created by the statute and regulations.

We vacate the district court's order and direct the district court, on receipt of our mandate, to dismiss the case without prejudice.[3] We do so without reaching the merits because the plaintiffs, all of whom are engaged in the highway construction business in Florida, lack standing to pursue their claims.

We organize the opinion as follows. In part I, we summarize in subpart A the provisions of the federal set-aside and minority business participation program and, in subpart B, its Florida counterpart. In part II, we set forth the plaintiffs' claims, as presented in their amended complaint, and the district court's dispositive order. In part III, we determine that the plaintiffs lack standing.

## I.

## A.

Congress authorized the appropriation of federal funds to aid states in highway construction under STURAA.[4] STURAA and the federal regulations thereunder direct that states that want to receive federal funds for highway construction must have set-aside and minority business participation programs to ensure that minority businesses have the maximum opportunity to compete for the contracts involving federal funds. Section 106(c)(1) of STURAA provides:

> *Except to the extent that the Secretary determines otherwise,* not less than 10 per centum of the amounts authorized to be appropriated under [STURAA and the prior highway aid appropriations act, the Surface Transportation Assistance Act of 1982] after the date of the enactment of this Act shall be expended with small businesses owned and controlled by socially and economically disadvantaged individuals.

Pub.L. No. 100–17, § 106(c)(1), 101 Stat. at 145 (emphasis added).[5]

A small business owned and controlled by a socially and economically disadvantaged individual, or a disadvantaged business enterprise (DBE),[6] 49 C.F.R. § 23.62, is, almost invariably, a small business owned or controlled by a member of a minority group or a woman. Women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, and Asian–Indian Americans are presumptively socially and economically disadvantaged. *Id.*[7]

---

3. Because we do not decide this appeal on the merits, we must direct the district court to dismiss the case without prejudice. *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 777 F.2d 598, 604 n. 16 (11th Cir.1985), cert. denied, 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986).

4. Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub.L. No. 100–17, 101 Stat. 132; *see also* 23 U.S.C. §§ 101–158 (1988). The Federal Highway Administration (FHWA) of the United States Department of Transportation (USDOT) grants funds to the states for specific highway construction programs and projects, 23 U.S.C. §§ 105–106, 110; it provides up to 75%—generally the majority— of the funds needed for such projects, with the states providing the remainder, *id.* § 120.

5. This provision is nearly identical to section 105(f) of the Surface Transportation Assistance Act of 1982 (STAA), Pub.L. No. 97–424, § 105(f),

96 Stat. 2097, 2100. STAA authorized the appropriation of federal highway construction funds through 1986, *id.* § 105(a), 96 Stat. at 2099; STURAA extended this funding through 1992, Pub.L. No. 100–17, § 106(a), 101 Stat. at 144–45. Regulations promulgated under section 105(f) of STAA and section 106(c) of STURAA are codified at 49 C.F.R. pt. 23(D) (1989).

6. The federal regulations use the term "disadvantaged business"; the nearly identical Florida regulations use the term "disadvantaged business enterprise." The abbreviation DBE will be used for both throughout this opinion.

7. The presumption that members of these minority groups are socially and economically disadvantaged is rebuttable. 49 C.F.R. § 23.62. States that want federal funds must implement a procedure by which third parties may challenge the disadvantaged status of any individual

This statute and the regulations thereunder impose three requirements on states that want to receive federal highway funds. First, each state must set and meet an annual goal, which the Federal Highway Administration (FHWA) of the United States Department of Transportation (USDOT) must approve, for DBE participation in highway construction projects funded with federal grants. *Id.* §§ 23.61, .64, .66.[8] The FHWA always approves a goal of ten percent or more. *Id.* § 23.66(a). It *may* approve a goal of less than ten percent if the state justifies the goal by showing that the state is making all appropriate efforts to increase DBE participation in federal aid contracts, and, despite these efforts, a goal of less than ten percent represents a reasonable expectation for DBE participation given the availability of DBEs in the state. *Id.* § 23.66(b).[9] Florida each year has set and met a DBE goal of ten percent.

Second, each state that wants to receive federal highway funds must agree *not to discriminate* on the basis of race, sex, color, or national origin in the award of federally assisted contracts, *id.* §§ 23.-7, .41(a), .43(a)(2), while at the same time making every reasonable and necessary effort to insure that minority businesses have the maximum opportunity to compete for and perform contracts, *id.* §§ 23.-1(a), .41(a), .43(a)(1). These requirements become part of every initial financial assistance agreement between the state and the federal government under which the state receives federal funds and every subsequent contract between the state and any contractor that involves the expenditure of federal funds. *Id.* § 23.43(a).

Third, each state that wants to receive federal highway funds must develop a minority business enterprise (MBE)[10] program, which the FHWA must approve before it will grant any highway aid funds, and which becomes part of every financial assistance agreement between the state and the FHWA. *Id.* §§ 23.41(a)(3)(i), .41(b)-(c), .43(b). To receive FHWA approval, the state's MBE program must include, among

presumed to be disadvantaged. *Id.* § 23.69. Florida provides such a challenge procedure in Fla.Admin.Code Ann. r. 14–78.007(7).

States also may determine, on an ad hoc basis, that individuals outside the listed groups are socially and economically disadvantaged. 49 C.F.R. § 23.62.

8. Although the regulations state that all "recipients" of federal highway construction funds (including private parties like contractors that receive such funds indirectly through contracts with direct recipients like states, 49 C.F.R. § 23.5) should set and meet a DBE participation goal of at least 10%, *id.* § 23.61(b), only certain recipients, such as states, must submit this overall goal to the FHWA each year and receive FHWA approval, *id.* §§ 23.41(a), .64(a), .66. Florida must establish an MBE program under section 23.41(a)(3)(i), as an applicant for federal highway construction funds; it therefore must submit an overall goal and receive FHWA approval.

9. When it submits a goal of less than 10%, the state must (1) provide a justification explaining why the goal is low, (2) obtain the signature or concurrence of the governor, and (3) consult with minority community resources to assess the availability of DBEs and the adequacy of the state's efforts to increase DBE participation. *Id.* § 23.64(e). The justification must include information on (1) the state's efforts to locate DBEs,

(2) the state's efforts to inform DBEs of contracting opportunities, (3) the state's initiatives to encourage and develop DBEs, (4) legal and other barriers to 10% DBE participation and the state's efforts to overcome the barriers, (5) the availability of DBEs, (6) the size and characteristics of the minority population in the state, and (7) a summary of the state's efforts to increase DBE participation through consultations with community resources. *Id.* § 23.65.

10. Subpart C of 49 C.F.R. part 23, which requires states to implement MBE programs to receive highway construction funds but also covers many other types of federal aid, refers to minority business enterprises (MBEs) throughout; when it is imposing requirements limited to recipients of highway aid under STURAA and STAA, it refers to disadvantaged business enterprises (DBEs).

The definition of an MBE is almost identical to the definition of a DBE, and the terms are interchangeable for the purposes of this opinion. An MBE is a small business 51% owned and controlled by a member of a minority group or a woman. *Id.* § 23.5. Minorities include Blacks, Hispanics, Portuguese, Asian Americans, American Indians, Alaskan Natives, and other groups or individuals found to be disadvantaged under section 2[8](a) of the Small Business Act, 15 U.S.C. § 637 (1988). 49 C.F.R. § 23.5.

other features,[11] a set-aside procedure that limits competition for certain contracts to MBE and DBE prime contractors, *id.* § 23.45(k), and a minority business participation procedure under which the state requires each prime contractor that enters into a contract involving federal funds to meet (or demonstrate a good faith effort to meet) a goal, set by the state, for DBE subcontractor participation in that contract, *id.* § 23.45(g)(ii).[12]

A state that fails to comply with any of these three requirements may lose all or part of its federal highway funds. *Id.* § 23.68(b), (e)(1); *id.* § 23.43(b)-(c); 23 C.F.R. § 1.36 (1990). Two provisions of the federal regulations, however, allow states to escape certain of these requirements and still receive federal funds. First, as discussed above, the FHWA may approve an overall DBE participation goal of less than ten percent if the state justifies the goal. 49 C.F.R. § 23.66(b). Second, in "appropriate circumstances," a state may receive federal funds even if it does not have an MBE program or deviates from the MBE program requirements. *Id.* § 23.41(f).[13] An additional provision allows individual third parties within the states to challenge the presumption that a member of a minority group or a woman is socially and economically disadvantaged. *Id.* § 23.69. Theoretically, a state also may avoid the federal requirements by choosing not to apply for federal funds.

Florida law specifically authorizes the Florida Secretary of Transportation to obtain federal highway funds and "to make all contracts and do all things necessary to cooperate with the United States Government in the construction of roads under the provisions of such Acts of Congress and all amendments thereto." Fla.Stat. § 339.05. As the district court noted, the Florida set-aside and minority goal participation program seems to be based on the federal scheme, and most likely was enacted in part to allow Florida to receive federal aid highway funds, although the Florida program never explicitly states that it was instituted in response to the federal scheme. The language of the Florida stat-

---

**11.** Required components of an MBE program include: (1) a policy statement advocating maximum MBE participation; (2) designation of an MBE liaison officer and staff; (3) development of procedures ensuring that MBEs have an equitable opportunity to compete, including affirmative action techniques such as providing assistance in bonding and financing and providing training on contracting procedures; (4) encouraging the use of banks controlled by minorities or women; (5) providing an MBE directory; (6) setting up procedures to certify the eligibility of MBEs, including specific certification procedures in states receiving highway construction funds under STURAA; (7) *setting up percentage goals for MBE or DBE participation, including both overall goals and specific contract goals which each contractor must meet or demonstrate good faith efforts to meet;* (8) ensuring that contractors make good faith efforts to meet MBE contract goals; (9) providing a description of the methods by which the state will require contractors and subcontractors to comply with MBE requirements; and (10) *implementing set-asides reserving contracts to MBE bidders when three or more are qualified and state or local law permits.* 49 C.F.R. § 23.45.

**12.** To ensure that prime contractors on projects funded with federal funds make good faith efforts to meet DBE subcontractor participation goals, the federal regulation mandates that the state either require the contractor to include in its bid the names, addresses, proposed work (and dollar amount thereof) of each MBE subcontractor or prescribe other requirements of equal or greater effectiveness. *Id.* § 23.45(h)(1)–(2). States may consider the following factors, among others, to determine whether a contractor that has failed to meet a goal has made a good faith effort: (1) attendance at presolicitation MBE meetings; (2) advertisement of subcontracting opportunities; (3) timely notice of solicitation to MBEs; (4) followup on initial solicitation of MBEs; (5) selection of suitable portions of the work for MBE participation; (6) provision of adequate information to MBEs about the plans and specifications of the contract; (7) good faith negotiations with MBEs; (8) assistance with bonding, insurance, and credit to MBEs; and (9) use of minority community resources to obtain MBE participation. *Id.* § 23.45 app. A.

**13.** The head of the FHWA may exempt states or allow them to deviate from the MBE program requirements only in "exceptional" circumstances and only if the United States Secretary of Transportation concurs; the program with the modifications requested must still substantially comply with the requirements. If the state claims that it is forbidden by state law from including a particular provision in its program, but nonetheless should receive federal funds, it must cite the state law. *Id.* § 23.41(f).

ute and regulations echoes the federal scheme, and the Florida program contains several references to federal definitions and programs. *See, e.g., id.* § 339.0805 (reference to DBEs as defined by STU-RAA).

This summary of the federal DBE program, however, is useful only as background material for a consideration of the Florida program and as evidence of the manner in which Florida's Secretary of Transportation might be expected to act in order to receive federal funds. The merits of the federal program are not before us; the plaintiffs have sued no federal defendant and have alleged no way in which the Florida statute or regulations could be considered "a part of" the federal statutory scheme, as the district court found, so that the constitutional validity of that scheme could save the other when federal aid is being used. We recognize, of course, that if the State of Florida were to lose this federal aid because of its failure to meet the federal DBE and MBE requirements, the consequences would be heavy. In fiscal year 1987–88, the federal highway aid funds received by the FDOT and awarded to contractors were $278.4 million, from a total FDOT highway construction award of $436.2 million. In fiscal year 1988–89, as of March 28, 1989, the Secretary awarded $293.5 million in federal aid in a total award of $377.6 million.

#### B.

The Florida statute modeled on STU-RAA, section 339.0805, reads:

(1)(a) *Except to the extent that the [Secretary] determines otherwise,* not less than 10 percent of the amounts expended from the State Transportation Trust Fund shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined by the Surface Transportation and Uniform Relocation Assistance Act of 1987.

(b) In fulfilling this mandate, the department shall utilize every means available to it, including, but not limited to, *goals* and *set-asides* for competitive bidding and contracting only by, between, and among those firms which are certified by the department as socially and economically disadvantaged business enterprises and which are prequalified as may be appropriate. . . .

Fla.Stat. § 339.0805 (emphasis added). This statute governs FDOT highway construction contracts because the Secretary, through the FDOT, is authorized to expend funds from the State Transportation Trust Fund [14] to construct and maintain state highway systems and to match any federal funds granted to state highway systems. *Id.* § 339.08. The expenditures for the highway construction contracts at issue in this case, however, are only one type of expenditure from the fund among many authorized by the statute, as the fund covers all aspects of the state transportation system.[15]

Pursuant to the authority granted to him in Fla.Stat. § 334.044(2), the Secretary has promulgated regulations to implement section 339.0805 in Fla.Admin.Code Ann. ch. 14–78. These regulations provide definitions and allow set-asides and minority participation goals in certain circumstances to meet the ten percent goal of section 339.-0805. The Florida definition of a small

---

**14.** The State Transportation Trust Fund, which is maintained by the Comptroller within the state Treasury, Fla.Stat. § 339.081(1), contains revenues from the Florida gas tax, *id.;* funds from the sale, lease, or conveyance of property by the FDOT, *id.* § 339.04; and other funds accruing to the FDOT that are not required by law to be maintained in a separate trust, *id.* § 339.081(1).

**15.** The money contained in the fund may be used to pay FDOT administrative expenses; to construct and maintain the state highway sys-

tem; to match federal funds allocated to the state, city, and county highway systems; to pay for public transportation systems within the state; to reimburse cities or counties for funds expended on the state highway system; to finance economic development transportation projects; to match any federal funds allocated for any purpose, *id.* § 339.08; to provide rodent control, relocation assistance, and moving costs to the extent required by federal law on federal-aid projects; and to provide relocation assistance and moving costs on projects not involving federal aid, *id.* § 339.09(2)–(3).

business owned and controlled by a socially and economically disadvantaged individual, or a disadvantaged business enterprise (DBE),[16] is almost identical to the federal definition. A DBE is a small business that is fifty-one percent owned or controlled by a socially and economically disadvantaged individual. *Id. r.* 14–78.002(2)–(3). Women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, and Asian–Indian Americans are rebuttably presumed to be socially and economically disadvantaged. *Id.* rr. 14–78.002(1), .005(7)(b)(1).[17]

The regulations mandate that the Secretary, through the FDOT, must set an annual overall goal for DBE participation in FDOT expenditures in order to ensure that small businesses owned by socially and economically disadvantaged individuals have the maximum opportunity to participate in FDOT contracts. *Id.* rr. 14–78.001, .003(1).[18] The Secretary's overall goal for the past several years has been to achieve ten percent DBE participation, al-

though presumably he could set a lower goal under the "except to the extent that the [Secretary] determines otherwise" language of section 339.0805.

To ensure that he meets this overall goal—that is, that enough DBEs participate in contracts he awards—the Secretary may use two procedures: a set-aside or a DBE subcontractor participation goal. Under a set-aside, the Secretary allows *only* DBE prime contractors to bid on certain contracts, excluding nonDBE firms from the bidding process altogether. *Id. r.* 14–78.003(2)(a).[19] Under a DBE participation goal, the Secretary requires the prime contractor who wins a specific contract to subcontract a certain percentage of that contract to DBE subcontractors. *Id. r.* 14–78.003(2)(b).[20] The Secretary, in the specifications of the contract, states that DBE subcontractors must perform a certain percentage of the entire dollar amount of the contract, but does *not* himself require that certain subcontracts be reserved for DBEs.[21] The choice of which subcon-

---

16. Florida also has an MBE program for other state and local contracts, Fla.Stat. §§ 287.093, .094–.0947, 288.701–.714, which is not at issue in this case.

17. The Secretary certifies minority- and female-owned businesses as DBEs, and provides a list of certified DBEs to contractors. Fla.Admin. Code Ann. r. 14–78.005. The Secretary may suspend or revoke the DBE certification of a business for several reasons, including the failure of the DBE to fulfill its contractual obligations with contractors. *Id.* r. 14–78.008.

In addition to the presumptively disadvantaged groups, individuals already certified as socially and economically disadvantaged under section 2[8](a) of the federal Small Business Act, 15 U.S.C. § 637, and implementing regulations are also disadvantaged under the Florida program. Fla.Admin.Code Ann. rr. 14–78.002(1), .005(7)(b)(2).

The regulation also would allow an individual not within one of the presumptively disadvantaged groups to achieve DBE status if he proves social and economic disadvantage. *Cf.* 49 C.F.R. § 23.62. Wisconsin, for example, has certified a white male disabled Vietnam veteran as a disadvantaged individual. *Milwaukee County Pavers Ass'n v. Fiedler,* 731 F.Supp. 1395, 1402 (W.D.Wis.1990). The Secretary, however, in practice denies certification to any person not within the listed groups, although a person denied certification may appeal the decision.

18. Factors considered in setting this overall goal include the number and type of contracts the Secretary awards, the number of DBEs available, and the past experience of the Secretary in meeting goals. Fla.Admin.Code Ann. r. 14–78.003(1)(a)–(c).

19. The Secretary may only implement a set-aside if at least three qualified DBE prime contractors are available to bid on the project. *Id.* r. 14–78.003(2)(a)(2).

20. A DBE prime contractor that is the low bidder on a contract containing a DBE goal is not required to meet the subcontracting goal, as its participation as prime contractor allows the entire amount of the contract to be counted toward the overall DBE goal. *Id.* r. 14–78.003(2)(b)(4).

21. The Secretary sets goals for DBE subcontractor participation on a contract-by-contract basis, considering the type of work to be let, the subcontracting opportunities in the contract, the value of the contract, and the number of certified DBEs available to perform the work. *Id.* r. 14–78.003(2)(b)(1). The DBE goals are limited to 50% of the identified potential for DBE participation for contracts for $1 million or less, and to 75% of the identified potential for DBE participation for contracts greater than $1 million. *Id.* r. 14.003(2)(b)(2). Thus, if the Secretary awards a $1 million contract and he determines that the total potential for DBE subcon-

tracts will be awarded to DBEs is thus left to each individual prime contractor.[22] Although DBE goals on some projects are set at more than ten percent, many contracts have no requirement of DBE participation. The lowest bidder to meet the DBE goal generally receives the contract, although a low bidder that fails to meet the goal still may get the contract by demonstrating that it has made a good faith effort to include DBEs. *Id.* r. 14–78.003(2)(b)(3); *see infra* at p. 1198 & note 26.

NonDBE *prime* contractors may be affected in two ways by the program. They might be excluded from bidding altogether if a contract is set aside for DBEs, or they might be required to meet or demonstrate a good faith effort to meet a DBE subcontractor participation goal if they choose to bid on a contract that includes such a goal in its specifications. In addition, the regulations impose a third requirement on prime contractors: each must develop a DBE program, which the Secretary must approve before he will award any contracts to that contractor. *Id.* r. 14–78.003(4)(b).[23] A nonDBE *sub*contractor might be affected by only one aspect of the program: a prime

contractor might accept a DBE bid for a subcontract rather than the lower bid of the nonDBE subcontractor in order to meet a DBE goal.

An individual prime or subcontractor that believes that a DBE set-aside or goal is unfair or unwarranted on equal protection grounds and that may be unable to obtain a contract because it cannot meet the program requirements, however, has several administrative or judicial methods, integral to the program, to alert the Secretary to a possible equal protection violation and allow him to apply the program provisions in a constitutional manner by eliminating goals and set-asides that are not lawful remedial responses to past or present racial discrimination in the State of Florida.

First, the regulations provide that any third party, including a prime or subcontractor,[24] may challenge the socially and economically disadvantaged status of any individual who is presumed to be socially and economically disadvantaged because he or she is a member of a minority group or a woman. *Id.* r. 14–78.007(7).[25] Thus, a con-

---

tracts in that contract is 20% (or $200,000), he may set a goal of 10% (or $100,000) for DBE participation.

**22.** For example, the Secretary might announce bidding for a $1 million contract, and might specify that a DBE must perform 10%, or $100,000, of that contract. The general contractor, not the Secretary, then decides to award a subcontract for grassing and sodding to a DBE and to contract with a DBE for the delivery of gravel in order to meet this goal.

To meet its DBE goals on a contract, a prime contractor is allowed to include such items as the full amount of a DBE subcontract on which the DBE itself has subcontracted 49% of the work (even to nonDBEs); certain expenditures for materials and supplies to DBE suppliers and manufacturers; fees or commissions for professional, technical, consulting, or managerial services; expenditures for delivery of materials and supplies to the job site; and fees or commissions charged for supplying bonds or insurance required by the contract. *Id.* r. 14–78.-003(2)(b)(6). The test to determine whether expenditures to DBEs may be counted towards the goal is whether the DBE has performed a commercially useful function in the contract, evaluated in light of factors such as the amount of work subcontracted and normal industry practices. *Id.* r. 14–78.003(2)(b)(6)(c). A DBE meets

this standard if it actually performs and manages 51% of the subcontract, *id.,* and it may subcontract up to 49% of the work "consistent with normal industry practices," *id.* r. 14–78.-003(2)(b)(6)(d). If a DBE subcontractor is unable to perform successfully, the prime contractor must make a good faith effort to obtain a replacement DBE. *Id.* r. 14–78.003(2)(b)(5).

**23.** The DBE program becomes part of every contract between the contractor and the Secretary, and must include, among other components, the designation of a liaison officer to aid in the solicitation of DBE subcontractor bids and to assist DBEs in obtaining bonding, financing, and technical assistance, and the development of a record-keeping system to monitor the contractor's DBE efforts. *Id.* r. 14–78.003(4).

**24.** The language of the rule, which permits a challenge by any third party, is very broad. For the purposes of this opinion, we focus on a challenge that might be brought by a contractor in an effort to prevent unlawful discrimination against it.

**25.** No third party, however, may challenge the disadvantaged status of an individual already certified as socially and economically disadvantaged under section 2[8](a) of the federal Small

tractor presumably could obtain an administrative ruling that Eskimos and Aleuts, for instance, who are presumptively disadvantaged as Native Americans, *id.* r. 14–78.002(1)(d), are nevertheless not disadvantaged for highway construction contracts awarded in Florida. A subcontractor that feels that it has been discriminated against by the award of a subcontract to a specific DBE firm could use this challenge procedure to cause that firm to lose its DBE status. Similarly, a prime contractor that feels that the award of a set-aside contract to a DBE prime is discriminatory might challenge the disadvantaged status of the minority prime contractor.

Second, a prime contractor that may be unable to obtain the award of a contract because it cannot meet the DBE goal for that contract may demonstrate to the Secretary at the time it submits its bid that it has made a good faith effort to meet the goal and that the Secretary therefore

should consider its bid.[26] If the Secretary is not satisfied that the contractor has made a good faith effort to meet the DBE goal and awards the contract to someone else, the contractor may seek immediate administrative review of the award, Fla.Admin.Code Ann. ch. 14–25 (1986), and may appeal a final agency decision in the Florida courts, *see C.H. Barco Contracting Co. v. State Dep't of Transp.*, 483 So.2d 796 (Fla.Dist.Ct.App.1986). If the contractor demonstrates to the satisfaction of the Secretary (or the courts) that it has made a good faith effort to obtain DBE participation, its bid will be considered. If its bid is the lowest, it will receive the contract.

Third, a prime contractor who is "adversely affected" by a bid solicitation or award may file a protest, which generally suspends the bid solicitation process or award until a final agency resolution of the matter. Fla.Stat. §§ 120.53(5), 337.11(3)(b); Fla.Admin.Code Ann. ch. 14–25.[27] Al-

---

Business Act, 15 U.S.C. § 637. Fla.Admin.Code Ann. r. 14–78.007(7).

**26.** The Secretary will consider a bid that does not meet the DBE goal if the bidder, considering all relevant circumstances, "could not meet, despite its good faith efforts," the goal set for DBE participation. Fla.Admin.Code Ann. r. 14–78.003(2)(b)(3). In evaluating whether the prime contractor has made a good faith effort to meet the DBE goal, the Secretary considers factors including, but not limited to, (1) whether the bidder contacted all certified DBEs in the area who perform the type of work the bidder intends to subcontract; (2) whether the bidder selected "economically feasible" portions of the contract for subcontracting; (3) whether the bidder provided assistance in reviewing the plans and specifications of the contract to interested DBEs; (4) whether other bidders met the DBE goal; (5) whether the bidder either submitted all quotations from DBEs or provided an explanation of why the bidder will not use the DBE who submitted a quotation; (6) whether the bidder assisted interested DBEs in obtaining bonding, credit, or insurance; (7) whether the solicited DBEs had the capability to perform the work the bidder attempted to subcontract; (8) whether the bidder's efforts, considering all relevant circumstances, "could not reasonably be expected" to produce enough DBE participation to meet the goal; and (9) whether the bidder has used DBEs on other contracts within the past six months. *Id.* r. 14–78.003(2)(b)(3)(c). To demonstrate its good faith efforts, the bidder must include in its initial bid submission sufficient information concerning its failure to meet the DBE goal. *Id.* r. 14–78.003(2)(b)(3)(a)(v).

**27.** Only those contractors that are certified by the Secretary as qualified to bid on a contract may file a protest to the solicitation or award of that contract. Fla.Stat. § 337.11(3)(d); *id.* § 337.14 (providing that contractors bidding for contracts over $250,000 must be certified). This protest procedure thus is available only to the prime contractor plaintiffs, not the subcontractors.

The Secretary must announce his decision either to award a contract to a specific bidder or to reject all bids, *id.* § 337.11(3)(a), and a contractor "adversely affected" by the proposed solicitation or award must file a written protest and post a bond of up to $5000, *id.* § 337.11(3)(b); Fla.Admin.Code Ann. rr. 14–25.022(3), .024.

After a protest is filed and the solicitation or award of bids is suspended, the Secretary and the protester have seven days in which to reach a mutual agreement resolving the problem. *Id.* r. 14.25.026(1). If the matter is not resolved, the Secretary or his designee must conduct a hearing pursuant to Fla.Stat. § 120.57 and Fla.Admin.Code Ann. ch. 14–6 (1986), *id.* r. 14–25.026(2)–(3), and must issue an order resolving the matter, *id.* rr. 14–6.030, .031.

Although generally the filing of a protest will suspend the bid solicitation or award process, the Secretary may continue the process while a protest is pending if he shows that unless the process continues without delay, (1) an immediate and serious danger to public health, safety, or welfare will exist, Fla.Stat. § 120.53(5)(c); Fla.Admin.Code Ann. r. 14.25.025(1); or (2) the state will suffer a substantial loss of funding, Fla.Stat. § 337.11(3)(c).

though the regulation does not provide a definition of "adversely affected," the Florida courts have held that a contractor may challenge a DBE set-aside or goal on equal protection grounds in an administrative protest to a bid solicitation or award. *See Cone Corp. v. State Dep't of Transp.*, 556 So.2d 530, 531 (Fla.Dist.Ct.App.1990) (a bidder that had not raised an equal protection challenge to a DBE goal in a bid protest waived its right to challenge the goal on constitutional grounds). *See generally Key Haven Associated Enters. v. Board of Trustees of the Internal Improvement Trust Fund*, 427 So.2d 153, 157 (Fla.1982) (a party appealing a final agency action under Fla.Stat. § 120.57 to the Florida courts may raise constitutional challenges to the facial validity of a statute, the facial validity of an agency regulation implementing the statute, or the constitutionality of the agency's application of the statute or regulation).[28] The relief that a contractor that successfully challenges a DBE set-aside or goal in an administrative protest procedure will receive is an order that the set-aside or goal not be instituted for the contract or an order that the contract be awarded to the party who brought the challenge.[29]

Fourth, either a prime or a subcontractor may file an equal protection challenge to the solicitation or award of a contract containing a DBE set-aside or goal in a Florida state court. A subcontractor, because it may not file an administrative protest to a solicitation or award, *see supra* note 27, may go directly to Florida state court and raise all of its claims without exhausting administrative remedies. *See Junco v.*

*State Bd. of Accountancy*, 390 So.2d 329, 331 (Fla.1980) ("the principle underlying the exhaustion requirement is inapplicable where adequate remedies do not abide within the administrative sphere"). A prime contractor, on the other hand, must exhaust the administrative procedures before a Florida court will hear its claim, as an appeal from a final agency action. *Key Haven*, 427 So.2d at 157–58; *State Dep't of Transp. v. Hendry Corp.*, 500 So.2d 218, 221 (Fla.Dist.Ct.App.1986). Only one exception to this exhaustion requirement exists: if the prime contractor opts to bypass the administrative procedure, it may challenge the facial constitutionality of section 339.0805 in a Florida court *without* exhausting administrative remedies. *Key Haven*, 427 So.2d at 157 (citing *Gulf Pines Memorial Park, Inc. v. Oakland Memorial Park, Inc.*, 361 So.2d 695, 699 (Fla. 1978)). If the contractor chooses to file a protest, however, it will be required to exhaust administrative procedures and raise its claim that the statute is facially unconstitutional on judicial appeal from agency action. *Id.; Hendry Corp.*, 500 So.2d at 221 (a contractor that had already completed a protest and filed an appeal therefrom could not challenge the facial constitutionality of section 339.0805 in a Florida trial court, but was limited to raising the claim in an appeal from the agency decision).

Fifth, nothing precludes a prime or subcontractor that wishes to raise an equal protection challenge to a set-aside or goal in a particular contract from filing its challenge directly in federal court when the plans and specifications of the contract are

---

28. An agency may not declare a statute unconstitutional on its face in an administrative proceeding, but a party may complete the administrative process and then challenge the facial constitutionality of the statute on direct appeal from the final agency action to a Florida district court of appeal. *Key Haven*, 427 So.2d at 157 (citing *Department of Revenue v. Young Am. Builders*, 330 So.2d 864 (Fla.Dist.Ct.App.1976)).

29. In *Capeletti Bros. v. Department of Transp.*, 499 So.2d 855, 857 (Fla.Dist.Ct.App.1986), the court, holding that the proper procedure for a prime contractor to contest the inclusion of a goal for the participation of women in a particu-

lar project was a protest to the bid solicitation, not a challenge of the award of the contract to another bidder, stated: "The purpose of the bid solicitation protest provision is to allow an agency, in order to save expense to the bidders and to *assure fair competition* among them, to *correct and clarify plans and specifications prior to accepting bids.*" *Id.* (emphasis added). If the plaintiff in *Capeletti* had filed a timely protest to a goal, the Secretary, if he had found that the challenge to the goal was merited, would have corrected the contract's specifications by eliminating or altering the goal before he accepted bids.

announced.[30] A federal court considering such a constitutional challenge could grant a temporary restraining order preventing the award of the contract until the merits of the challenge are resolved and, if it finds that the claim is merited, order the Secretary not to set aside the contract, to eliminate the goal, or to award the contract to the plaintiff. *See Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 619 (11th Cir. 1985) (a district court may enjoin the performance of a contract and may order a government contracting officer to award the contract to an unsuccessful bidder if "it is clear that, but for the unlawful conduct of the contracting officer, the contract would have gone to the successful bidder").[31]

In summary, for the award of highway construction contracts in Florida, the program works as follows. The Secretary of Transportation sets an overall goal for DBE participation in all monies expended from the State Transportation Trust Fund. Unless the Secretary in his discretion determines that the goal should be less than ten percent, the goal is set at ten percent. The Secretary, through the FDOT, then decides to award a highway construction contract from funds in the State Transportation Trust Fund, using either state funds or a combination of federal aid and state funds. If three qualified DBE prime contractors are available, the Secretary might institute a set-aside, limiting bidding on that contract to DBEs only. If the Secretary does not limit bidding to DBEs, he may set a goal for DBE subcontractor participation in that contract. This goal, which does not specify which areas of the contract DBEs must perform, is included in the specifications of the contract sent to prime contractors. Each prime contractor then decides which portions of the contract to award to DBE subcontractors, and prepares and submits a bid listing its determination of DBE participation. The Secretary awards the contract to the lowest bidder that either meets the DBE goal or demonstrates that it has made good faith efforts to meet that goal.

This process could adversely affect a nonDBE contractor in one of three ways. First, a nonDBE *prime* contractor may be excluded from bidding altogether on a set-aside contract. Second, a nonDBE *prime* contractor could submit a low bid which does not meet the DBE goal, fail to demonstrate its good faith effort to meet the goal, and lose the contract to a higher bidder that met the goal or demonstrated its good faith efforts to do so. Third, a nonDBE *sub*contractor might submit a low bid to a prime contractor but lose the subcontract to a DBE solely because of the DBE goal.

A contractor that is aggrieved by this process has many different administrative or judicial opportunities to challenge the program's application on the grounds that such application violates the equal protection clause of the fourteenth amendment. First, the contractor could file a third party challenge to the presumptively disadvantaged status of any individual who is seeking highway construction work. Second, it could demonstrate to the Secretary that it has made a good faith effort to meet the

---

**30.** The contractor presumably would file such an action under 42 U.S.C. § 1983 (1988), alleging that the Secretary had deprived the contractor of the equal protection of the laws under color of state law. Therefore, under *Patsy v. Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982), the contractor would not be required to exhaust state administrative remedies before bringing its federal suit. *See also Grandison v. Smith,* 779 F.2d 637, 642 (11th Cir.1986).

If the contractor filed its action under 42 U.S.C. § 2000d (1988), it similarly would not be required to exhaust state administrative remedies before suing in federal court. *Doe v. Garrett,* 903 F.2d 1455, 1460 (11th Cir.1990) ("it is established, as a general matter, that Title VI [42 U.S.C. §§ 2000d to 2000d–7] ... does not incorporate Title VII's requirement of exhaustion of administrative remedies").

**31.** A district court ordering such relief must consider several equitable factors, including:

[W]hether the contract has already been awarded to another party, and if so, is being performed; the extent an order awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the public, and competing bidders, in the agency's adherence to the law; and the cost to the government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful bidder whose price may have been considerably lower.

*Choctaw,* 761 F.2d at 619.

DBE goal and that its bid should therefore be considered. Third, it could challenge either a set-aside or a DBE goal in contract specifications by protesting a bid solicitation or award. Fourth, it could challenge the solicitation or award of a contract in state court, after exhausting the state administrative remedies available to it. Fifth, it could seek relief in a federal court against the solicitation or award of a contract.[32]

## II.

■ The plaintiffs in this case are eight prime contractors[33] and one specialty subcontractor[34] engaged in the business of highway construction in the State of Florida. All are owned by white males. In their complaint, the plaintiffs alleged that the Secretary of Transportation[35] has been implementing the section 339.0805 DBE program in a manner that discriminates against them on account of their race, in violation of the equal protection clause of the fourteenth amendment;[36] as a result, they have been deprived of FDOT highway construction work and, unless the Secretary is permanently enjoined from implementing the DBE program, they will lose more work.[37]

The plaintiffs sought no relief with respect to the construction contracts they

---

32. In addition to these remedies, any person "adversely affected" by any action of the Secretary may exercise the appeal rights granted by 49 C.F.R. part 23. Fla.Admin.Code Ann. r. 14-78.0081.

33. The prime contractor plaintiffs are the Cone Corporation; C.H. Barco Contracting Company, Inc.; Asphalt Pavers, Inc.; J.W. Conner & Sons, Inc.; Cone Constructors, Inc.; Leware Construction Company; Capeletti Brothers, Inc.; and Hewitt Contracting Company, Inc.

34. The specialty subcontractor plaintiff, O.B. Brooks & Sons Grassing, Inc., does grassing, fencing, mulching, and erosion control work. The company regularly bids for the subcontracts for these components of state highway construction projects.

35. In addition to the Secretary, the plaintiffs sued the FDOT and the Governor. The Governor has been dismissed from the action, and the plaintiffs' claims against him are not before us.

36. Although women, as well as members of minority groups, are presumptively disadvantaged, the plaintiffs do not allege that the Secretary has denied or is likely to deny them equal protection on account of sex.

The plaintiffs also asked for declaratory and injunctive relief with regard to the Secretary's "practice, policy, custom, and usage" of encouraging or requiring consideration of racial or ethnic criteria in the selection of bids for highway construction work. Because the plaintiffs have not alleged, or presented, any facts indicating that such a pattern of behavior has existed independently of the statute or rules, we do not consider this request for relief as referring to a separate claim. We thus limit our consideration to the operation of section 339.0805 and the regulations promulgated thereunder.

37. The plaintiffs sought relief on their equal protection claim against the Secretary under 42 U.S.C. § 1983 (1988), which provides a right of action to those deprived of a constitutional or statutory right "under color of law." They also sought relief against the Secretary under 42 U.S.C. § 1981 (1988), which provides that all citizens have the same contract and property rights as white citizens, and under 42 U.S.C. § 2000d (1988), which prohibits discrimination under any program receiving federal assistance.

The plaintiffs also sought relief against the FDOT under all three of these provisions, but the district court dismissed the section 1983 and section 1981 claims, finding that the FDOT was immune from suit under the eleventh amendment of the United States Constitution. The court allowed plaintiffs to proceed against the FDOT on their section 2000d claim, however, under the express abrogation of eleventh amendment immunity found in 42 U.S.C. § 2000d-7(a)(1).

We agree with the district court that section 2000d gives plaintiffs an implied private right of action against the FDOT and the Secretary. *See Cannon v. University of Chicago*, 441 U.S. 677, 703, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979) ("we have no doubt that Congress ... understood Title VI [section 2000d *et seq.*] as authorizing an implied private cause of action for victims of the prohibited discrimination"); *Doe*, 903 F.2d at 1460; *Bossier Parish School Bd. v. Lemon*, 370 F.2d 847, 852 (5th Cir.), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967). Supreme Court precedent is unclear, however, as to whether or under what conditions a plaintiff suing under section 2000d may receive compensatory, as opposed to declaratory and injunctive, relief. *Guardians Ass'n v. City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (seven justices find a right of action, but differ on whether a plaintiff must show discriminatory intent to receive compensatory relief).

In this circuit, until the Supreme Court clarifies its position, a plaintiff may receive only prospective declaratory and injunctive relief in a section 2000d suit. *Franklin v. Gwinnett*

have already lost. Presumably, those contracts have been completed, and an order declaring that the Secretary denied the plaintiffs, or any one of them, the equal protection of the laws in awarding those contracts could gain the plaintiffs nothing save a moral victory. Rather, the plaintiffs sought a judgment declaring section 339.-0805 and the regulations promulgated thereunder unconstitutional on their face and permanently enjoining the Secretary from implementing the DBE program. As an interim measure, the plaintiffs asked the district court to issue a preliminary injunction directing the Secretary to refrain from setting aside or including goals in contracts pending the entry of final judgment.

The Secretary promptly moved the court to dismiss the plaintiffs' complaint for failure to state a claim for relief or, alternatively, to require the plaintiffs to file a more definite statement. While his motion was pending, the court heard and denied the plaintiffs' application for a preliminary injunction. The court thereafter required the plaintiffs to amend their complaint with a more definite statement. The plaintiffs did so, filing an amended complaint (which, for our purposes, added nothing to the original complaint). The Secretary then an-

swered the amended complaint, denying the plaintiffs' allegations of racial discrimination and challenging their standing to prosecute the suit.

After the parties joined issue, the plaintiffs moved for summary judgment; they also renewed their application for a preliminary injunction. The court denied their application, but granted them summary judgment.[38] In its dispositive order, the court declared that, on their face, section 339.0805 and the regulations promulgated thereunder denied the plaintiffs the equal protection of the laws guaranteed them by the fourteenth amendment with respect to FDOT contracts funded solely by the State of Florida. The court reasoned, under the strict scrutiny standard of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 491–92, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989), that although a state "has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction" if it "identifies that discrimination with the particularity required by the Fourteenth Amendment," the Florida legislature had not identified *any* prior discrimination within the state of Florida before enacting the DBE program, and therefore the program was invalid.[39] The dis-

*County Pub. Schools,* 911 F.2d 617, 622 (11th Cir.1990) (discussing Title IX but stating that the analysis is interchangeable with Title VI); *Drayden v. Needville Indep. School Dist.,* 642 F.2d 129, 133 (5th Cir. Unit A 1981) ("this private right of action under Title VI encompasses no more than an attempt to have any discriminatory activity ceased"). The language of section 2000d–7 does not change this result. *See* 42 U.S.C. § 2000d–7(a)(2) ("[i]n a suit against a State for a violation of [section 2000d], remedies (including remedies both at law and at equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State"); *Franklin,* 911 F.2d at 621–22 (finding that this language "has no direct bearing on … whether a cause of action for money damages will lie").

Thus, although plaintiffs may sue both the Secretary and the FDOT under section 2000d, they may receive only declaratory and injunctive relief. Their action against the FDOT is, therefore, redundant. The FDOT may act only through human agents. If a court were to issue an injunction purporting to bind the FDOT, the Secretary would be responsible for ensuring

that the agency obeyed the injunction, and would bear the risk of civil contempt proceedings to enforce its terms. *See* Fed.R.Civ.P. 65(d) (injunctions binding on the parties to the action and "their officers, agents, servants, employees, and attorneys"); *Blalock v. United States,* 844 F.2d 1546, 1559 (11th Cir.1988) (describing the function of civil contempt in enforcing injunctions). This opinion, accordingly, will refer to the Secretary as the sole defendant.

**38.** The plaintiffs immediately appealed this ruling. *See supra* note 1.

**39.** The parties in this case stipulated, and the district court found, that when the Florida legislature enacted section 339.0805 it made *no* formal studies or findings of discrimination in the highway construction industry in Florida but relied instead on the congressional findings of discrimination in the industry nationwide. Given our disposition of this appeal, we need not decide whether the legislators' reliance on Congress' findings would satisfy *Croson*'s mandate. We note that *Croson* seems to indicate that a blanket reliance on federal findings is unacceptable as evidence that a state has sufficiently

trict court noted, however, that the statute was modeled after an almost identical federal scheme, and concluded that the Florida program was mandated by, or was an extension of, the federal program.[40] Because a very similar federal program had passed constitutional muster in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the court concluded that when implemented with federal funds, the Florida program was constitutional.

The plaintiffs now challenge this decision. They contend that the district court erred in upholding section 339.0805 and the regulations with respect to FDOT contracts funded by the federal government. They also contend that the district court erred in denying them permanent injunctive relief.[41]

We do not reach the merits of plaintiffs' challenges. As the following discussion makes clear, the plaintiffs lack standing to bring this suit; accordingly, the district court, rather than granting the plaintiffs the relief it gave them, should have dismissed the case.[42]

### III.

■ Article III of the United States Constitution limits the jurisdiction of the federal courts to actual cases and controversies. U.S. Const. art. 3, § 2. The standing doctrine is an aspect of this case or controversy requirement, *Flast v. Co-*

hen, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968), and has its origins in "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975) (citing *Barrows v. Jackson*, 346 U.S. 249, 255–56, 73 S.Ct. 1031, 1034–35, 97 L.Ed. 1586 (1953)); *O'Hair v. White*, 675 F.2d 680, 685 (Former 5th Cir.1982) (en banc). The constitutional aspect of the standing requirement eliminates claims "in which the plaintiff has failed to make out a case or controversy between himself and the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Lynch v. Baxley*, 744 F.2d 1452, 1455–56 (11th Cir.1984).[43] The requirement that the individual plaintiff have standing is based on the need "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ A plaintiff must meet three requirements to have article III standing. First, if, as here, the plaintiff seeks declaratory and injunctive relief, he must demonstrate that he is likely to suffer future injury;

identified prior discrimination. 488 U.S. at 503–06, 109 S.Ct. at 726–27. In this case, however, it is unclear, and we need not determine, whether Florida's reliance on congressional findings was such a blanket acceptance, or whether specific portions of the congressional testimony might support Florida's legislative scheme.

**40.** According to the district court, "the federal highway funds do not come to the State of Florida in fee simple. They come in 'trust,' and Florida's use of the funds necessitates strict compliance with the Congressional mandate regarding use of such funds."

**41.** The defendants, on cross-appeal, assert, *inter alia*, that the plaintiffs lack standing to prosecute their facial attack on Florida's DBE program.

**42.** Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a

dismissal for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *Morast v. Lance*, 807 F.2d 926, 932 n. 6 (11th Cir.1987).

**43.** Prudential limits on standing, which are not implicated in this case, include the principle that federal courts should avoid deciding generalized grievances that present "abstract questions of wide public significance," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982), the requirement that the plaintiff's complaint be within the "zone of interests" protected by the statute or constitutional guarantee at issue, *id.* (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)), and the requirement that a plaintiff, even though he may have established an article III case or controversy, assert his own legal rights and interests, not the rights of third parties, *id.* at 474, 102 S.Ct. at 760.

second, that he is likely to suffer such injury at the hands of the defendant; and third, that the relief the plaintiff seeks will likely prevent such injury from occurring. *Whitmore v. Arkansas,* — U.S. —, —, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990); *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Gladstone, Realtors,* 441 U.S. at 99, 99 S.Ct. at 1608; *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976)). Although each of these concepts may blend into the others, the most important is the injury requirement.[44]

■ The first prerequisite for standing to seek the equitable relief the plaintiffs asked for in this case is the demonstration of a threatened injury. *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Marshall Durbin Co. v. United States Envtl. Protection Agency,* 788 F.2d 1490, 1492 (11th Cir.1986). The plaintiff must present "specific, concrete facts" showing that the challenged conduct will result in a "demonstrable, particularized injury" to the plaintiff so that the plaintiff "personally w[ill] benefit in a tangible way" from court action. *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210. The injury must

be "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Kerr v. City of W. Palm Beach,* 875 F.2d 1546, 1554 (11th Cir.1989). If the plaintiff is prosecuting a constitutional claim, moreover, the injury must be the deprivation of a constitutional right. *Cf. Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 ("the standing question ... is whether the constitutional ... provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief") *O'Hair,* 675 F.2d at 686 ("injury may be to rights existing solely by virtue of a ... constitution").[45]

■ The second prerequisite for standing, in a case like the one at hand, is that the plaintiff must show that the defendant is likely to cause the anticipated injury— there must be a "fairly traceable" nexus between the threatened deprivation of the constitutional right and the action of the defendant. *Simon,* 426 U.S. at 38, 41–42, 96 S.Ct. at 1924–26; *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325. "The injury must both be caused by the defendant and be remediable by the defendant." *Wehunt v. Ledbetter,* 875 F.2d 1558, 1567 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990).[46]

---

44. *See* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531.4 (1984).

The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant to any purpose of standing doctrine. Causation in turn bears on remedial benefit, since a remedy addressed to actions that have not caused the injury will not alleviate the injury. *Id.*

45. We realize that the question of whether a party has demonstrated a sufficient injury to litigate a constitutional claim—an actual or threatened deprivation of a constitutional right—necessarily involves a limited inquiry into the merits of the plaintiff's claim to determine whether the injury the plaintiff asserts might stem from a violation of that constitutional guarantee. *Cf. Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 ("Although standing in no way depends on the merits of the plaintiff's conten-

tion that particular conduct is illegal, it often turns on the nature and source of the claim asserted." (citation omitted)); *O'Shea,* 414 U.S. at 499, 94 S.Ct. at 677 (standing analysis "obviously shade[s] into [analysis determining] whether the complaint states a sound basis for equitable relief"). This is unavoidable, and provides no justification for ignoring the article III requirement of a case or controversy and engaging in a full-scale analysis of the merits.

46. The third prong of standing is that the plaintiff must show that the threat of injury is substantially likely to be removed by a favorable decision. *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924; *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595; *Marshall Durbin Co.,* 788 F.2d at 1492. This third prong is closely linked to the second prong (causation), and indeed is sometimes expressed as part of that prong. *Allen,* 468 U.S. at 759 n. 24, 104 S.Ct. at

In sum, a plaintiff seeking declaratory[47] and injunctive relief demonstrates these first two standing requirements only if the plaintiff shows that the defendant is likely to injure the plaintiff.[48] The Supreme Court has acknowledged this in a series of cases. *See Lyons*, 461 U.S. at 105–09, 103 S.Ct. at 1667–69 (plaintiff once subject to a police stranglehold had no standing to seek injunctive relief without a showing that "he was likely to suffer future injury" from police brutality); *Juidice v. Vail*, 430 U.S. 327, 331–33 & n. 9, 97 S.Ct. 1211, 1215–16 & n. 9, 51 L.Ed.2d 376 (1977) (plaintiffs who had been released from prison had no standing to seek injunctive relief when the complaint did not allege "the likelihood, or even the possibility, of future contempt orders"); *Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976) (plaintiffs seeking injunction barring an alleged policy of police brutality had no standing based on "what one of a small, unnamed minority of policemen might do to them in the future"); *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. at 676 (plaintiffs challenging alleged discriminatory bail-setting, jury selection, and sentencing had no standing to seek injunction without a showing that they were likely to be arrested and subject to the challenged practices); *Golden v. Zwickler*, 394 U.S. 103, 108–09, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (plaintiff who had been convicted for distributing anonymous handbills in past election campaign but whose future conviction was "most unlikely," alleged no controversy deserving declaratory relief for future campaigns). Like the Supreme Court, this circuit also has acknowledged the plaintiff's need to show the likelihood of injury as a prerequisite for standing to obtain equitable relief. *See Kerr*, 875 F.2d at 1554 (plaintiff bitten by a police dog had no standing to seek declaratory and injunctive relief absent a showing that an unlawful seizure is likely to recur); *Lynch*, 744 F.2d at 1456–57 (plaintiff who was realistically threatened by a repetition of his experience had standing to seek injunction barring state practice of detaining persons awaiting civil commitment in county jails).

In their amended complaint, the plaintiffs alleged that they lost FDOT work because of the DBE program.[49] They al-

---

3328–29 n. 24 (in some circumstances, "the 'redressibility' analysis is identical to the 'fairly traceable' analysis"); *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2631.

**47.** When a plaintiff seeks a declaratory judgment that a state statute is unconstitutional, as the plaintiffs do here, the requirements for standing must be strictly enforced. *Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965).

**48.** This standing determination—in the equal protection context of this case—of how a government official is likely to treat the plaintiff in the future may be based on two types of evidence: (1) specific instances in the past where the defendant has injured the plaintiff or others, *Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665; *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. at 676; *Lynch*, 744 F.2d at 1457; and (2) statutes, regulations, settled policies, judicial decisions, and other rules which establish the official's authority, mandate the acts that he must perform, and circumscribe his discretion, if any, *cf. Lyons*, 461 U.S. at 105–06, 103 S.Ct. at 1667; *Kerr*, 875 F.2d at 1554.

**49.** We note that if one of the prime contractors or the subcontractor plaintiff had shown that it had lost, or was in imminent danger of losing, a specific contract or subcontract because of race in violation of the fourteenth amendment, it would have standing to seek individualized relief, such as damages (if it sued a defendant that was not immune from liability) or an order directing the Secretary to eliminate the set-aside or goal for that contract or to award the contract to the plaintiff. *See, e.g., Choctaw Mfg. Co.*, 761 F.2d at 615–16 (prime contractor standing; "[n]o serious doubt exists that [a disappointed bidder] suffer[s] economic loss by virtue of [its] inability to obtain the contract at issue" (quoting *Hayes International Corp. v. McLucas*, 509 F.2d 247, 255 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975)); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1265 (5th Cir.1978) ("It is by now well settled in this Circuit that unsuccessful bidders for government contracts may have standing to invoke judicial review of procurement decisions."); *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 701, 709–10 (5th Cir.1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974) (prime contractor that lost bid had standing to challenge minority business provisions in the Small Business Act); *Harrison and Burrowes Bridge Constructors, Inc. v. Cuomo*, 743 F.Supp. 977, 986–87, 994–95 (N.D.N.Y.1990); *Capeletti Bros. v. Broward County*, 738 F.Supp. 1415, 1416–17 (S.D.Fla.1990); *Contractors Ass'n v. Philadelphia*, 735 F.Supp. 1274,

leged no facts, however, to support this allegation; that is, they did not point to any specific contract they lost because the Secretary discriminated against them on account of their race.[50] In short, the plaintiffs' allegations of past racial discrimination at the hands of the Secretary are nothing more than bald conclusions. The plaintiffs' allegations of future injury suffered the same infirmity; the plaintiffs merely concluded that, because of the Secretary's DBE requirements, "they will be injured in their business or property." This conclusory statement was the sole support for their prayer that the district court declare section 339.0805 and the regulations thereunder unconstitutional on their face and enjoin the Secretary from enforcing them.

The plaintiffs provided the district court no facts—either in their amended complaint or in support of their motion for summary judgment—from which the court could predict whether the Secretary would deny them equal protection of the laws in awarding future highway construction contracts.[51] Thus, all the court had before it was the Florida DBE statute, section 339.0805; the regulations promulgated thereunder; the federal DBE statute, STURAA; its implementing regulations; and the Supreme Court's decisions in *Fullilove* and *Croson.* From these statutes, regulations, and Supreme Court decisions—and them alone—the court had to predict how the Secretary would probably treat the plaintiffs in the future if he followed the law,

1283–84 & n. 3 (E.D.Pa.1990); *cf. Rocks v. City of Philadelphia,* 868 F.2d 644, 645–48 (3rd Cir. 1989); *Glasgow, Inc. v. Federal Highway Admin.,* 843 F.2d 130, 134–36 (3rd Cir.1988).

The plaintiffs in this case, however, have neither shown that they lost a single contract because the Secretary violated the fourteenth amendment, *see infra* note 50, nor sought individualized relief for any past loss.

**50.** Whether a plaintiff has standing to sue is generally determined by assessing the allegations of his complaint. *Warth,* 422 U.S. at 510, 95 S.Ct. at 2206. If, when it addresses the standing issue, the court has facts beyond the four corners of the complaint before it—such as, in this case, the evidence adduced in support of the plaintiffs' motion for summary judgment—the court may consider such facts. *Gladstone, Realtors,* 441 U.S. at 109 n. 22, 99 S.Ct. at 1613 n. 22; *see also Church of Scientology,* 777 F.2d at 607 n. 24 (standing is "a legal determination based on the facts established by the record"). If it considers facts not disclosed in the complaint, the court, in effect, treats the complaint as having been amended to conform to the evidence. *See* Fed.R.Civ.P. 15(b).

The record presented to the district court in support of the plaintiffs' motion for summary judgment disclosed two allegations in which the Secretary, in the past, *may* have caused a plaintiff to lose an FDOT contract on account of race. Neither of these allegations was specific enough to permit the district court to conclude, however, that a plaintiff had suffered a constitutional injury, and thus may suffer such an injury in the future.

The first allegation came from Douglas P. Cone, president of the Cone Corporation (a prime contractor). Cone alleged, in his deposition, that his company had lost a specific contract on which it had been the low bidder be-

cause it failed to meet the DBE goal for the contract.

Second, Cone, in testimony at the preliminary injunction hearing relevant to O.B. Brooks & Sons Grassing, Inc.'s (a subcontractor's) standing, stated that his company, to meet the DBE goal on a project, had awarded a specific subcontract to a DBE subcontractor instead of Brooks, although Brooks had submitted the low bid.

Both of these descriptions are vague, and do not, without further evidence, establish that the Secretary, in the past, deprived plaintiffs of the equal protection of the laws. Brooks, for instance, did not demonstrate any injury to it, as it did not show that the prime contractor actually performed the contract at issue. Neither plaintiff, furthermore, presented any evidence that it had attempted to avoid the alleged discriminatory application of the statute through the administrative or judicial challenge machinery in the scheme. Cone, indeed, admitted that his company had not attempted to present a good faith justification for failing to meet the DBE goal for the contract it lost.

**51.** The district court, indeed, specifically found that the plaintiffs alleged no injury:

The Plaintiffs have also argued and presented some evidence concerning harm to individual prime and subcontractors. But the Plaintiffs have not alleged that any individual plaintiff was harmed in any *specific instance* on a particular contract or opportunity to bid by the manner in which the Defendants have applied the federal requirements, and have not sought individualized relief with respect to application of the Florida statute or regulation to an individual plaintiff with respect to a particular contract or opportunity to bid.... [T]here are no allegations that the Florida program has been applied in [an] unconstitutional manner to a particular plaintiff having standing to make that claim.

and thus whether the plaintiffs were entitled to the relief they sought.

To make its prediction, the court had to look first to the Florida statute. If section 339.0805 required the Secretary to institute set-asides and goals that were not lawful remedial responses to identified past or present racial discrimination in Florida, then the court could conclude that the plaintiffs might suffer a denial of equal protection—in a case where, but for the set-aside or goal, they would have been the successful bidder. If, to the contrary, section 339.0805 allowed the Secretary to use his discretion to institute set-asides and goals only where necessary to remedy identified racial discrimination, then the district court had to look elsewhere—to the Secretary's regulations, or STURAA and its regulations—to predict the Secretary's future conduct. The district court took neither of these steps; it simply bypassed the question of the plaintiffs' standing to sue and concluded that because Florida's DBE program could be implemented in an unconstitutional manner, it was unconstitutional on its face (except when implemented with federal funds). Had the court undertaken the two-step inquiry described above, it would have concluded, first, that section 339.0805 does not mandate a denial of equal protection, and, second, that there is nothing in the Secretary's regulations or the federal DBE program that would produce such a denial.[52]

As we observe in our explanation of Florida's DBE program, there is nothing in section 339.0805 that requires the Secretary to deny the plaintiffs the equal protection of the laws. To be sure, the Secretary is charged with giving DBEs the maximum opportunity to participate in FDOT projects, but, in carrying out this task, he does not have to engage in the sort of racial discrimination the fourteenth amendment proscribes. On the contrary, his oath of office—which requires him to uphold the Constitution and laws of the United States, Fla.Stat. § 876.05—requires him to avoid such unlawful conduct. Section 339.0805 accommodates his obligation to obey the Constitution by giving him a wide breadth of discretion. *Id.* § 339.0805 (setting a DBE goal of ten percent "except to the extent that the [Secretary] determines otherwise").

To argue that section 339.0805 requires the Secretary to discriminate in violation of the fourteenth amendment is to conclude that the first several words of the statute, giving the Secretary discretion, are meaningless. The plaintiffs might argue, for instance, that the legislative grant of discretion to the Secretary constituted, in effect, an unlawful delegation of legislative power to an administrative agency. Fla. Const. art. 2, § 3.[53] It is unlikely, however,

(Emphasis in original.)

**52.** We are aware that two recent decisions of this circuit did not explicitly address the question of standing and allowed contractors to pursue declaratory and injunctive relief against the operation of county and city minority business set-aside and goal programs. *See Cone Corp. v. Hillsborough County*, 908 F.2d 908 (11th Cir. 1990); *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283 (11th Cir.1990). *But see id.* at 1287–88 (Tjoflat, J., specially concurring) (arguing that plaintiffs had no standing). Since the opinions handed down in support of these decisions did not address the standing issue, we infer no view on the issue from these decisions.

In addition, the determination of whether a case or controversy exists must be made on a case-by-case basis. *Hendrix v. Poonai,* 662 F.2d 719, 721–22 (11th Cir.1981) (per curiam). Standing must be decided on the record before the court; we thus decide the issue here on what is before us.

**53.** This constitutional provision states, in pertinent part: "No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Fla. Const. art. 2, § 3. In Florida, the legislature may not give another branch of government the power "to enact a law or to declare what the law shall be." *Tallahassee Memorial Regional Medical Center, Inc. v. Meeks,* 560 So.2d 778, 784 (Fla.1990) (quoting *State v. Atlantic Coast Line Ry.,* 56 Fla. 617, 47 So. 969, 976 (1908)). The legislature must make all fundamental policy decisions, but may give agencies discretion in administering programs pursuant to minimal standards sufficient to "enable the agency and the courts to determine whether the agency is carrying out the legislature's intent." *Id.* (quoting *Department of Ins. v. Southeast Volusia Hosp. Dist.,* 438 So.2d 815, 819 (Fla.1983), *appeal dismissed,* 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984)). The legislature also may give agencies the power to determine facts to which established policies of the legislature will apply. *Florida Welding &*

that a Florida court considering this state law question would agree.[54] Indeed, one Florida court has found that the enactment of section 339.0805 was a *lawful* delegation of power. *See Hendry Corp. v. State Dep't of Transp.*, 503 So.2d 944, 944 (Fla. Dist.Ct.App.1987) (the statute is "a valid, reasonable, and constitutional grant of discretion").[55]

The Secretary has exercised this lawfully delegated statutory discretion by promulgating regulations that allow him to administer the DBE program in a constitutional manner. To conclude that section 339.0805 will require the Secretary to injure the plaintiffs means that the fact that the regulations may allow the Secretary to avoid a fourteenth amendment violation is of no moment; the regulations are invalid. In other words, the Secretary gave himself, by regulation, more authority than the statute allowed. For us to find a denial of equal protection under this scenario, we would have to say that the statute plainly requires the Secretary to deny equal protection, that is, a Florida court interpreting Florida law *could not reasonably conclude* otherwise, and that the regulations—to the extent that they allow the Secretary to exercise discretion—are a nullity. We conclude, on the contrary, that section 339.-0805 on its face does not direct the Secretary to violate the fourteenth amendment; consequently, the statute, itself, does not provide proof that the Secretary is likely to deny plaintiffs the equal protection of the laws in letting highway construction contracts.[56] *See Kerr*, 875 F.2d at 1554 (a

*Erection Serv., Inc. v. American Mutual Ins. Co.,* 285 So.2d 386, 388 (Fla.1973).

**54.** We note that the United States Supreme Court, in applying a federal constitutional principle akin to Florida's, observed that a federal statute similar to Fla.Stat. § 339.0805 provided sufficient standards for a delegation of legislative power to an executive agency. Describing the Public Works Employment Act of 1977, Pub.L. No. 95–28, § 103(f)(2), 91 Stat. 116, the *Fullilove* Court stated:

Although the statutory MBE provision itself outlines only the bare bones of the federal program, it makes a number of critical determinations: the decision to initiate a limited racial and ethnic preference; the specification of a minimum level for minority business participation; the identification of the minority groups that are to be encompassed by the program; and the provision for an administrative waiver where application of the program is not feasible. *Congress relied on the administrative agency to flesh out this skeleton, pursuant to delegated rulemaking authority, and to develop an administrative operation consistent with legislative intentions and objectives.*

*Fullilove*, 448 U.S. at 468, 100 S.Ct. at 2769 (emphasis added).

**55.** The court stated:

Appellant would have us take the first dozen words out of context in order to find an unlawful delegation of legislative authority. This we decline to do. If the entire legislative scheme is considered, it becomes apparent that the statute is not vague, and does not grant the secretary of [F]DOT unbridled authority so as to render the statute unconstitutional. It is a valid, reasonable, and constitutional grant of discretion to the secretary of

[F]DOT which is designed to permit the [F]DOT to carry out the DBE ... program, and to comply with the legislative intent and the federal restrictions on [F]DOT in the letting of contracts.

*Hendry Corp.*, 503 So.2d at 944; cf. *Broward County v. La Rosa*, 505 So.2d 422, 423–24 (Fla. 1987) (a delegation of judicial power is too extensive when it gives an agency the power to award unliquidated damages for discrimination; an agency may determine, however, whether discrimination has occurred).

**56.** The opposite seems to have been the case in *Fullilove*. In a footnote, the Supreme Court, alluding to the contractors' standing to seek declaratory and injunctive relief, said:

In their complaint, in order to establish standing to challenge the validity of the program, petitioners alleged as "[s]pecific examples" of economic injury three instances where one of their number assertedly would have been awarded a public works contract but for enforcement of the MBE provision. *Petitioners requested only declaratory and injunctive relief against continued enforcement of the MBE provision;* they did not seek any remedy for these specific instances of assertedly unlawful discrimination.

448 U.S. at 480 n. 71, 100 S.Ct. at 2776 n. 71 (emphasis added).

The *Fullilove* contractors are distinguishable from the plaintiffs here in two ways. First, the *Fullilove* contractors seem to have alleged specific instances of past unlawful discrimination in sufficient detail to allow the Court to use these instances as evidence of likely future discrimination. The plaintiffs here, on the contrary, demonstrate no such past instances. *See supra* at 1205–06 & note 51.

Second, the minority business provision challenged in *Fullilove* provided that recipients of

general policy that permits but does not require unconstitutional conduct is not facially unconstitutional; therefore, plaintiffs have no standing to seek declaratory or injunctive relief against the continuation of the policy). If such proof exists, therefore, it must be found in the Secretary's regulations or the federal DBE program, which provides an incentive for the Secretary to act in a way that will enable the FDOT to receive federal funds. We find none.

As our outline of the Florida and the federal programs indicates, both programs provide many administrative and judicial escape hatches that allow the Secretary to avoid a violation of the fourteenth amendment. For instance, in the Florida program, DBE goals are set after a consideration of many different factors, good faith waivers are allowed, a contractor presumably might establish that a particular individual or group is not disadvantaged in Florida, and contractors may challenge bid solicitations and awards in administrative and state judicial proceedings on equal protection grounds. *See supra* at 1197–1200. The federal scheme contains similar escape hatches, including provisions by which the Secretary may avoid unlawful discrimination and still receive federal funds by submitting a goal of less than ten percent or by getting an exemption from the DBE program requirements. *See supra* at 1192–1194. Moreover, the federal program expressly directs the Secretary, on pain of losing federal funds, *not to discriminate unlawfully*. *See supra* at 1193. Although the Florida program contains no similar prohibition, the Secretary's oath of office serves the same function. We conclude, therefore, that nothing in the Florida statute and regulations, and nothing in the federal scheme, shows a likelihood that the Secretary will deprive the plaintiffs of contracts on account of their race in violation of the fourteenth amendment. Having demonstrated no likely injury at the hands of the Secretary, the plaintiffs have no standing to prosecute this action.[57]

federal public works grants, such as the State and City of New York (defendants in *Fullilove*), were required to institute 10% goals in each public works project for which the recipient received a federal grant. *Fullilove*, 448 U.S. at 454, 100 S.Ct. at 2762 ("no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance ... that at least ten per[cent] of the amount of each grant shall be expended for minority business enterprises" (quoting Public Works Employment Act of 1977, Pub.L. No. 95–28, § 103(f)(2), 91 Stat. 116)). Thus, the State and City of New York in *Fullilove*, unlike the Secretary here, were *required* by federal law to set a 10% goal in each project. Furthermore, although the *recipient* of aid (the city or state) could get a waiver of this goal under the provision at issue in *Fullilove*, the contractors, unlike the plaintiffs here, had no control over whether such a goal was set, because the scheme gave them no protest procedure. *Id.* app. at 494, 100 S.Ct. app. at 2783 ("Only the grantee can request a waiver" (quoting U.S. Dep't of Commerce, Economic Development Admin., Local Public Works Program, Round II, Guidelines for 10% Minority Business Participation in LPW Grants 13–15)).

The combination of the evidence of past injuries and the terms of the statute, which gave the grantees no discretion in setting goals and gave the contractors no opportunity to challenge the inclusion of goals in contracts, made it likely that the grantees who were sued in *Fullilove* would injure the plaintiffs in the future. The *Fullilove* plaintiffs, therefore, had standing to seek declaratory and injunctive relief. As neither of these factors exist here, *Fullilove* does not govern this case.

**57.** Plaintiffs contended in support of their motion for summary judgment that the structure of the DBE program itself constitutes a sufficient threat of injury to give them standing for declaratory and injunctive relief: the program is likely to burden them, and those like them, with added clerical costs, the possibility of being forced to accept higher DBE bids for subcontracts, and, most importantly, the requirement that they trigger the Secretary's duty to avoid discrimination by using the protest procedures. As examples of past instances of this added burden, Cone alleged that his company had suffered increased clerical costs because of the bookkeeping requirements of the program (his company has one employee who does nothing but keep records on the company's DBE goals and program) and was forced to subcontract work to DBEs at higher prices in order to meet the goals (on one job, the DBE subcontractor bid his company accepted was $13,000 higher than the low bid). Cone also described the protest procedures as "very expensive," although he stated that his company had filed several protests unrelated to the DBE goals.

These burdens, however, are not sufficiently particularized and individual injuries to give the plaintiffs standing to seek the relief they ask. The burdens from the operation of the statute

## IV.

A fundamental principle of constitutional law dictates that a federal court should refuse to decide a constitutional issue unless a constitutional decision is strictly necessary. *Rescue Army v. Municipal Court,* 331 U.S. 549, 568–72, 67 S.Ct. 1409, 1419–21, 91 L.Ed. 1666 (1947); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 777 F.2d 598, 604 (11th Cir. 1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986). As the Supreme Court has stated: "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944); *Church of Scientology,* 777 F.2d at 604.

In the same vein, a federal court should not speculate concerning the existence of standing or "piece together support for the plaintiff." *Anderson v. City of Alpharetta,* 770 F.2d 1575 exh. at 1582 (11th Cir. 1985) (per curiam) (incorporating order of district court); *see also Whitmore,* —— U.S. at ——, 110 S.Ct. at 1723 ("[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing"); *Sims v. Florida, Dep't of Highway Safety and Motor Vehicles,* 862 F.2d 1449, 1467 (11 Cir.1989) (Tjoflat, J., dissenting) ("unadorned speculation will

not suffice to invoke the federal judicial power" (quoting *Diamond v. Charles,* 476 U.S. 54, 66, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1976)). In this case, we decline to imagine an injury sufficient to give the plaintiffs standing when they have demonstrated none. If, at some future date, a DBE set-aside or goal which may not be a lawful remedial response to identified past or present discrimination precludes the plaintiffs from obtaining FDOT highway construction work, the plaintiffs may return to the district court and seek relief.

The judgment of the district court is VACATED and the case is REMANDED with the instruction that it be dismissed without prejudice.

IT IS SO ORDERED.

---

are imposed on all contractors. The DBE program and its added costs are essentially part of the plans and specifications of each contract. Furthermore, the expense of the protest procedure falls on DBE contractors as well as nonDBE firms; the procedures also are available to DBE firms challenging contracts that are not set aside or that do not contain goals. As one plaintiff stated, the added burden is simply an "enforced cost of doing business" in the State of Florida, like hiring an accountant or a lawyer.

The contractor is not actually injured by these increased costs because it simply includes them in its bid and passes the cost on to the FDOT. *See Capeletti Bros.,* 738 F.Supp. at 1417 ("[i]t would be the irrational businessman who did not factor such costs into his bid.... [I]t is the [governmental entity] who ultimately absorbs the costs of its program by paying more to complete public construction projects"). Even

if the contractor does not always include the increased cost in its bid, as the plaintiffs' evidence seems to indicate, the resulting smaller profits are a problem common to all contractors. *See id.* ("even if there was an actual cost borne solely by the plaintiffs that could not be factored into a bid, the plaintiffs cannot show that this harm is unique to them and different from other bidders"). *But see Contractors Ass'n,* 735 F.Supp. at 1283–84 n. 3 (finding standing for an association of contractors who alleged, *inter alia,* that the expenses of one contractor member on a specific contract were higher because of the MBE requirements); *Rhode Island Chapter, Associated Gen. Contractors v. Kreps,* 450 F.Supp. 338, 346–47 n. 3 (D.R.I.1978) ("even the successful bidder reduces his profit by having to subcontract work he could have performed himself"); *Constructors Ass'n v. Kreps,* 441 F.Supp. 936, 945–46 (W.D.Pa.1977).