MICHIGAN ROAD BUILDERS ASSOCIATION, INC., a Michigan corporation; Ajax Paving Industries, a Michigan corporation; Argersinger–Morse Construction Company, a Michigan corporation; Bacco Construction Company, a Michigan corporation; Basile Sons, Inc., Peter A., a Michigan corporation; Bolen Asphalt Paving, Inc., a Michigan corporation; Cadillac Asphalt Paving Co., a Michigan corporation; Doan Construction Company, a Michigan corporation; Forsberg, Inc., T.A., a Michigan corporation; Hull Company, Inc., C.A., a Michigan corporation; Interstate Highway Construction, Inc., a Michigan corporation; Kelcris Corporation, a Michigan corporation; Maclean Construction Company, a Michigan corporation; Midwest Bridge Company, a Michigan corporation; Milbocker & Sons, Inc., a Michigan corporation; Molesworth Contracting Company, a Michigan corporation; J. Slagter & Son Construc-

tion Company, a Michigan corporation; Spartan Sign, Inc., a Michigan corporation; Walter Toebe Construction Company, a Michigan corporation; Ward and Van Nuck, Inc., a Michigan corporation, Plaintiffs,

v.

James J. BLANCHARD, as Governor of the State of Michigan; The Department of Transportation of the State of Michigan; James P. Pitz, as Director of the Department of Transportation; The Michigan State Transportation Commission; William C. Marshall, Rodger D. Young, Hannes Meyers, Jr., Stephen F. Adamini, Shirley E. Zeller, Nansi I. Rowe, Individually in their official capacity as members of the Michigan State Transportation Commission, Defendants.

No. 5:90–CV–37.

United States District Court,
W.D. Michigan, S.D.

April 11, 1991.

Barry R. Powers, Leonard M. Niehoff, John B. Weaver, Butzel, Long, Gust, Klein & Vanzile, P.C., Detroit, Mich., for plaintiffs.

David L. Balas, Patrick F. Isom and Larry F. Brya, Asst. Attys. Gen., Frank J. Kelley, Atty. Gen. Transp. Div., Lansing, Mich., for defendants.

## OPINION

HILLMAN, Senior District Judge.

In this action for declaratory and injunctive relief, plaintiffs claim that defendants have violated their constitutional rights by discriminating against them in awarding road construction projects. In granting contracts containing federal funds, the State of Michigan has set aside 1.32% of the dollars awarded for Disadvantaged Business Enterprises ("DBEs"). Plaintiffs contend that the state is unlawfully aiding women and minorities at the expense of white males.

Plaintiffs are the Michigan Road Builders Association, Inc. and a group of individual road contractors and subcontractors. Defendants are James J. Blanchard, Michigan's former governor; the Michigan Department of Transportation ("MDOT"); James J. Pitz, former Director of MDOT; the Michigan State Transportation Commission ("the Commission"); and the individual members of the Commission: William C. Marshall, Roger D. Young, Hannes Meyers, Jr., Stephen F. Adamini, Shirley E. Zeller, and Nansi I. Rowe.

For fiscal year 1991, MDOT established a goal that 15% of the total dollar amount of all construction contracts containing federal funds be awarded to DBEs. Of the total dollar amount awarded, approximately 1.32% was set-aside to be exclusively bid upon by, and thus awarded to, DBEs. Only woman- and minority-owned businesses, plaintiffs assert, may qualify as DBEs. Plaintiffs maintain that members of its association are precluded from bidding on and being awarded set-aside contracts because their businesses are owned by white males. Therefore, defendants' use of set-aside contracts, plaintiffs argue, unconstitutionally discriminates against plaintiffs based upon their race and sex.

It is undisputed that defendants have made no findings of prior discrimination in the construction industry in Michigan. Defendants respond that they are merely implementing a federal construction statute authorizing state recipients of federal funds to utilize set-asides. Plaintiffs do not challenge the constitutionality of the federal authorization statute. The gravamen of plaintiff's complaint is the charge that defendants are unconstitutionally implementing the federal statute by the use of set-aside contracts.

In their Third Amended Complaint, plaintiffs claim that defendants have violated the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 2000d et seq., Title VI of the Civil Rights Act of 1964. A bench trial was held on November 7 and 8, 1990 and post-trial arguments were heard on December 20, 1990. The parties have thoroughly briefed the issues. After careful consideration of the record, the court holds that plaintiffs have not

carried their burden of establishing standing. Further, the court holds that even if plaintiffs had established standing, defendants have not acted unconstitutionally. Consequently, plaintiff's prayer for declaratory and injunctive relief is denied.

## I. Findings of fact

1. Plaintiff Michigan Road Builders Association, Inc. ("Road Builders") is an association of contractors whose members perform highway construction contracts in the State of Michigan. Among the association's purposes, according to its constitution, is "to combat unfair practices." Road Builders' Constitution, art. II, Pl.Exh. 15. Another purpose is to "conduct only those activities which are for the common good and benefit alike for all members." *Id.*

Approximately 75% of the dollar volume of all state and federal road contracts in Michigan is performed by Road Builders' members. Tr. at 49. The association has approximately 120 members, approximately six of whom are certified Disadvantaged Business Enterprises ("DBEs"). Tr. at 49. The Executive Director of Road Builders, Lawrence Martin, testified that members of his association desire to bid on MDOT set-aside projects but are prohibited from bidding on such projects. Tr. at 45–46.

2. Individual plaintiffs are contractor and subcontractor firms. The only individual plaintiff who testified was Dorset Goff ("Goff"), owner of Spartan Sign, Inc. ("Spartan"). Spartan fabricates and erects highway traffic control signs and is a member of the Road Builders. Tr. at 312.

At trial, Goff was shown two advertisements from issues of the magazine, *Michigan Roads and Construction.* Tr. at 313; Pl.Exh. 22 and 23. Both of the advertisements were for MDOT contracts in which the bidder was required to be a DBE. Pl. Exh. 22 at 14; Pl.Exh. 23 at 14. Goff testified that his company would have bid on the projects if the advertised projects had not been set aside for DBE firms. Tr. at 313. Apparently, Goff would have bid on such projects because his company is capable of doing the work described in the advertisements. Tr. at 312. However,

Goff testified that Spartan has not applied for certification as a DBE. Tr. at 314.

3. Defendant James J. Blanchard was the governor of Michigan at the time this action was initiated. Defendant Michigan Department of Transportation ("MDOT") is a department of the executive branch of the state of Michigan. Defendant Pitz was the executive officer of MDOT and was responsible for executing the policy of the Michigan Transportation Commission. Defendant Commission is a constitutionally established body charged with establishing policy for MDOT. Mich. Const. art. 5, § 28. Defendants William C. Marshall, Rodger D. Young, Hannes Meyers, Jr. Stephen F. Adamini, Shirley E. Zeller, and Nansi I. Rowe, were members of the Commission and were officially responsible for establishing policy for MDOT.

4. In 1983, the United States Congress enacted a transportation authorization act entitled the Surface Transportation Assistance Act of 1982 ("STAA"), Pub.L. No. 97–424, 96 Stat. 2097. Section 105(f) of STAA provided:

> Except to the extent that the Secretary determines otherwise, not less than 10 per centum of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined by section 8(d) of the Small Business Act (15 U.S.C. § 637(d)) and relevant subcontracting regulations promulgated thereto.

96 Stat. at 2100.

The United States Department of Transportation promulgated regulations implementing this section. 48 Fed.Reg. 33432 *et seq.*, (codified at 49 C.F.R. § 23 (1986)). STAA incorporated the definitions of social and economic disadvantage of section 2[8] of the Small Business Act, 15 U.S.C. § 637(d), and the regulations promulgated pursuant to it. 49 C.F.R. § 23.

In 1987, Congress passed a subsequent transportation authorization act, the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"). Pub.L. 100–17, 101 Stat. 132.

Section 106(c) of STURAA contained essentially identical language to section 105(f) of STAA. STURAA also provided that not less than 10 percent of the funds authorized under the statute shall be awarded to disadvantaged businesses. 101 Stat. at 145. In addition, STURAA included women as a group presumed to be disadvantaged, refined the definition of small business, and required the Secretary of Transportation to establish minimum uniform criteria for states to use in determining whether a business can be certified as disadvantaged. 101 Stat. at 145–46.

5. Section 106(c) of STURAA applies to programs under the Federal Highway Administration ("FHWA"). The FHWA and MDOT mutually administer contracts involving federal highway funds in Michigan. As a condition of receiving federal funds for highway construction projects, Michigan must comply with federal regulations implementing STURAA, and specifically, those federal regulations relating to Disadvantaged Business Enterprises ("DBEs"). 49 C.F.R. § 23.68.

STURAA, as did its predecessor STAA, requires that "not less than 10 percent" of the funds authorized for the entire United States shall be awarded to DBEs. Pub.L. No. 100–17, § 106(c)(1), 101 Stat. at 145. In order to achieve the national minimum 10% mark, the federal regulations require that recipients of federal funds under STURAA, such as MDOT, establish an annual goal for the awarding of contracts and subcontracts to DBEs. The state recipient must then submit the goal to the United States Department of Transportation for approval. 49 C.F.R. § 23.64. The regulations permit deviation from the 10% statutory target either upward, 49 C.F.R. § 23.64(d), or downward, 49 C.F.R. §§ 23.-64(e), 23.65. Failure of a state recipient of STURAA funds to meet its DBE goals can result in termination of federal funding for federal transportation projects. 49 C.F.R. § 23.68(e)(2).

In setting its annual goal, MDOT is required by the regulations to consider criteria such as the number and types of contracts to be awarded, the number of DBEs available to compete for these contracts, and the results of past efforts to contract with DBEs. 49 C.F.R. §§ 23.64(d), 23.-45(g)(5); Tr. at 83–84, 90–96. After considering these factors, MDOT set its fiscal year 1991 DBE goal at 15%. Def.Exh. 25.

The regulations also require that recipients establish individual contract goals for DBE participation on specific prime contracts that have subcontracting possibilities. 49 C.F.R. § 23.45(g)(2)(ii); *see also* 49 C.F.R. part 23, subpart D, App. A. A prime contractor who is unable to meet a contract goal is still eligible to be awarded the prime contract if it can demonstrate good faith efforts to meet that goal. 49 C.F.R. §§ 23.45(g)(2)(ii), 23.45(h).

6. Under certain conditions, states are required to set aside contracts to be exclusively bid upon and awarded to DBEs. "Where not prohibited by state or local law and determined by the recipient to be necessary to meet MBE [1] goals, procedures to implement MBE set-asides shall be established." 49 C.F.R. § 23.45(k).

The regulations direct each state to "take all necessary and reasonable steps in accordance with 49 CFR Part 23 to ensure that minority business enterprises have the maximum opportunity to compete for and perform contracts." 49 C.F.R. § 23.43(a)(2). Discrimination based upon race, color, national origin, or sex, in connection with the award and performance of any federal contract under STURAA is prohibited. 49 C.F.R. §§ 23.7, 23.43(a)(2).

7. For a contracting business to be certified as a DBE, it must meet certain criteria as set forth in 49 C.F.R. § 23.53. A contracting firm is disadvantaged, according to the federal regulations, if it is small and is owned and controlled by individuals who are socially and economically disadvan-

---

1. "MBE," which is an acronym for "Minority Business Enterprise," is still used in various parts of the Code of Federal Regulations instead of "DBE." However, a "slightly different set of individuals is eligible to own and control a disadvantaged business than is eligible to own and control a minority business enterprise." 49 C.F.R. Subpt. D, App. A.

taged. 49 C.F.R. § 23.62; *see also* 49 C.F.R. Pt. 23, Subpt. D, App. A, B, and C.

Under the regulations, there is a rebuttable presumption that women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, or Asian–Indian Americans who own and control contracting businesses are socially and economically disadvantaged. 49 C.F.R. § 23.62; 49 C.F.R. Pt. 23, Subpt. D, App. C; Tr. at 102.

Other individuals may be found to be socially and economically disadvantaged on a case-by-case basis. 49 C.F.R. § 23.62; 49 C.F.R. Pt. 23, Subpt. D, App. C; Tr. at 102. If an individual applies for DBE certification, the state must make a determination of social and economic disadvantage. 49 C.F.R. Pt. 23, Subpt. D, App. C. "If a firm or other party believes that any recipient's social and economic disadvantage determination is in error, the firm or party may make an administrative certification appeal to the Department [of Transportation] as provided in 49 C.F.R. § 23.55." *Id.*

8. MDOT has implemented the federal regulation's DBE certification procedures set forth in 49 C.F.R. § 23.53(a)(1)–(6). Tr. at 143–152. Accordingly, MDOT utilizes six criteria in its DBE certification process, including a determination whether the disadvantaged individual is the actual owner and operator of the contracting firm. Tr. at 148. MDOT maintains a DBE Directory which lists all certified DBE's in Michigan with their respective work classifications. Def.Exh. 35.

9. Robert Anderson ("Anderson"), the Division Administrator of the Office of Small Business Liaison in the Bureau of Administration, testified that white male contractors have applied for DBE certification. In the past year, none have met the tests for establishing social and economic disadvantage. Tr. at 154, 255. Anderson testified that denials of DBE certification of minority or women contractors average approximately twenty percent a year. Tr. at 256.

10. On July 17, 1990, MDOT's Office of Small Business Liaison prepared a report entitled "Development of the 1991 Fiscal Year Overall Goal for DBE Participation."

Def.Exh. 19. This report set out the methodology used by MDOT to calculate its recommendation of the 15% DBE goal for fiscal year 1991. *Id.* The Commission received the report on July 25, 1990. Def. Exh. 21. The following day, the report was submitted to the Federal Highway Administration ("FHWA"). Def.Exh. 20.

After reviewing the report, plaintiff Road Builders asserted that it had "no objection to the procedure being used [to compute the 15% goal], which considers prior achievements, DBE contractor availability and the projected construction program." Letter of August 16, 1990 from Lawrence Martin, Executive Director of Road Builders, to Robert Anderson, Def. Exh. 22. Road Builders did object to the establishment of the 15% DBE goal on the basis that there had been no finding of past discrimination in Michigan. *Id.* The Commission received a copy of Road Builders' letter of August 16, 1990. Def.Exh. 23.

On August 22, 1990, the Commission adopted a 15% DBE goal, including a projected use of 1.32% set-aside contracts, for the fiscal year beginning October 1, 1990. Def.Exh. 25. The following day, MDOT sent the 15% DBE goal specifications to FHWA for review and approval. Def.Exh. 27. On October 1, 1990, FHWA approved MDOT's DBE Goal of 15%. Def. Exh. 32; Tr. at 198.

11. On September 26, 1990, the Commission approved forms that allow for the good faith waiver by contractors on certain contracts amenable to DBE subcontracting opportunities. Def.Exh. 30. On September 27, 1990, MDOT's Director forwarded the waiver forms to FHWA for review and approval. Def.Exh. 31. FHWA approved the waiver forms on October 2, 1990. Def. Exh. 33; Tr. at 186. The FHWA approved MDOT's continued use of the Commission's DBE procedures on October 3, 1990. Def. Exh. 34.

12. For fiscal year 1991, MDOT's 15% DBE goal and 1.32% DBE set-aside projects apply only to contracts containing federal funds. Tr. at 159–60, 257. Plaintiffs do not assert any unlawful conduct by

defendants in the awarding of state-funded contracts. Pl. Post-trial Br. at 2.

13. Plaintiffs do not seek injunctive relief as to the goals or set-asides adopted in any year prior to fiscal year 1991. Plaintiffs seek only prospective injunctive and declaratory relief.

14. Plaintiffs stipulate that STURAA and the regulations adopted pursuant to STURAA, 49 C.F.R. §§ 23.1 *et seq.*, are constitutional for purposes of this action. Tr. at 10, Pl. Trial Br. at 9, Pl. Post-trial Br. at 1.

## II. Conclusions of Law

### A. Eleventh Amendment

The court must first address whether it has jurisdiction over defendants under the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

In *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the United States Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71, 109 S.Ct. at 2312. However, the Court recognized that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state.'" 491 U.S. at 71 n. 10, 109 S.Ct. at 2312 n. 10; *see also Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The Sixth Circuit recently held that "*Will* leaves ample room for an action against state officials insofar as it seeks prospective relief allowed by the Eleventh

Amendment." *Sutton v. Evans,* 918 F.2d 654, 657 (6th Cir.1990). The present lawsuit seeks prospective injunctive relief. Therefore, the claims against the individual defendants—Blanchard, Pitz, and the members of the Commission—are not precluded by the Eleventh Amendment. However, the Fourteenth Amendment, § 1983, and § 1981 claims against MDOT and the Commission will be dismissed because these entities are state agencies, not state officials.[2]

### B. Governor Blanchard

Defendants argue that plaintiffs have presented no allegations of wrongdoing by Governor Blanchard. The court agrees. There was no testimony at trial alleging the governor had any role in establishing the Commission's use of set-asides or the DBE goal. In fact, policy-making for MDOT is established by the Commission. Tr. at 252–53. As plaintiffs have presented no facts that would indicate that Governor Blanchard had any decision-making role in the Commission, he will be dismissed from this action.

### C. Standing

Defendants claim that plaintiffs have not established standing to challenge the constitutionality of the MDOT program. Plaintiffs allege no injury to Road Builders itself, but rather, it is their claim that individual members of the association, including individual plaintiffs, have been harmed by the program.

■ Article III of the United States Constitution limits the jurisdiction of the federal courts to actual cases or controversies. U.S. Const. art. 3, § 2. The standing doctrine is one aspect of this case or controversy requirement. *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). The standing requirement weeds out claims "in which the plaintiff has failed to make out a case or contro-

---

**2.** Plaintiffs' claim under 42 U.S.C. § 2000d, Title VI, will proceed against all defendants under the express abrogation of Eleventh Amendment immunity in 42 U.S.C. § 2000d–7(a)(1). *See Cannon v. University of Chicago,* 441 U.S. 677,

703, 99 S.Ct. 1946, 1960–61, 60 L.Ed.2d 560 (1979) (In enacting Title VI, Congress authorized an implied private cause of action for victims of the prohibited discrimination).

versy between himself and the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The standing doctrine is based on the practical necessity of assuring "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The burden is on plaintiffs to "clearly and specifically" set forth facts sufficient to establish standing. *Whitmore v. Arkansas,* — U.S. ——, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990). Of course, the court's threshold inquiry into standing is unrelated to the merits of plaintiffs' substantive legal contentions. *Whitmore,* 110 S.Ct. at 1723.

■ To establish an Article III case or controversy, a plaintiff must meet three requirements. First, if a plaintiff seeks declaratory and injunctive relief, as plaintiffs do here, he must demonstrate that he is likely to suffer future injury. The most effective way of demonstrating future injury is to show past or present injury. Second, a plaintiff must show that he is likely to suffer such injury at the hands of the defendant. Third, the plaintiff must establish that the relief he seeks will likely prevent such injury from occurring in the future. *Whitmore,* 110 S.Ct. at 1725.

The first prong—injury in fact—must be "concrete in both a qualitative and temporal sense." *Whitmore,* 110 S.Ct. at 1723. Plaintiff must allege an injury to himself which is "distinct and palpable," as opposed to merely "abstract." *Id.* The alleged harm must be "actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted).

■ As for the standing of the individual plaintiffs in this case, only Spartan Sign, Inc. can plausibly argue standing. Spartan's president, Goff, testified that he would have bid on the advertised projects which he perused, apparently for the first time, in court. This does not establish standing.

First, Goff never applied for certification as a DBE. Plaintiffs would have the court assume that Goff would have been discriminated against based upon his sex and race had he applied for DBE certification. The court may not engage in such speculation. *See Whitmore,* 110 S.Ct. at 1723 (a federal court may not create its own jurisdiction by embellishing otherwise deficient allegations of standing). Rather, from the testimony the court heard, it could only assume that if Goff had met the requirements for establishing social and economic disadvantage, he would have been certified as a DBE regardless of his race and sex.

Second, Goff did not apply for either of the contracts shown to him in the advertisements. Nor did Goff testify that Spartan was available to complete the advertised projects. He only testified that he would have applied for the contracts because those were the type of projects upon which his company normally bid. Thus, the alleged injury Goff sustained is purely conjectural and hypothetical. Plaintiffs have not shown any real, concrete injury.

The Eleventh Circuit recently dismissed for lack of standing a group of contractors' challenge to DBE set-asides. *Cone Corp. v. Florida Department of Transportation,* 921 F.2d 1190 (11th Cir.1991). In *Cone,* the plaintiff contractors "did not point to any specific contract they lost because the Secretary [of the Florida Department of Transportation] discriminated against them on account of their race." 921 F.2d at 1206; *see also Id.* at 1206 n. 50. The Eleventh Circuit continued:

> In short, the plaintiffs' allegations of past racial discrimination are nothing more than bald conclusions. The plaintiffs' allegations of future injury suffered the same infirmity; the plaintiffs merely concluded that, because of the Secretary's DBE requirements, "they will be injured in their business or property." ... The plaintiffs provided the district court no facts ... from which the court could predict whether the Secretary would deny them equal protection of the laws in awarding future highway construction contracts.

*Id.* at 1206. In the end, the Eleventh Circuit declined "to imagine an injury sufficient to give plaintiffs standing when they have demonstrated none." *Id.* at 1210.

In *Carpenter v. Barnhart*, No. 88–3678, slip op. (4th Cir. January 16, 1990) (*per curiam*) [894 F.2d 401 (table), plaintiffs in a DBE set-aside lawsuit alleged standing based upon "their loss of opportunities to contract with a government agency or department." Slip op. at 9. The Fourth Circuit found that this claim amounted "to no more than an assertion of hypothetical loss of bids." *Id.* Plaintiffs' claim was "an abstract grievance about the DBE program. The federal courts are not 'publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding.'" *Id.* at 9–10 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982)).

By merely pointing to advertised projects and testifying that he would have bid on such projects, Goff has not established standing. The court must speculate that Goff would have been discriminated against had he applied for DBE certification because he is a white male. The court must then conjecture that Goff would have applied for the contracts and been available to perform the advertised projects. For these reasons, Goff has not established standing.

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986) (citation omitted). An association may litigate in federal court on behalf of its members if its members "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . ." *Warth v. Selden*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975). "So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. *Id.*

■ The Supreme Court has expressed this doctrine in a three-part test. An association has standing to bring suit on behalf of its members when:

1) its members would otherwise have standing to sue in their own right;

2) the interests it seeks to protect are germane to the organization's purpose; and

3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

■ The first prong of the *Hunt* test does not require that each and every member of an association must show injury in fact. *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 735 F.Supp. 1274, 1286 (E.D.Pa.1990). However, in this case, no member of Road Builders has shown standing. For the court to assume that members of Road Builders exist who would be discriminated against based upon their race and sex would be pure conjecture.

The United States Supreme Court has dismissed an action by a home builders association asserting a claim for prospective relief from a town's zoning ordinance which the association alleged denied low income citizens' housing. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Warth*, the association did not aver that any of its members had applied to respondents for a building permit or a variance with respect to any projects. 422 U.S. at 516, 95 S.Ct. at 2214. The Court continued:

Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members, or that any of its

members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention.

422 U.S. at 516, 95 S.Ct. at 2214.

In *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 735 F.Supp. 1274 (E.D.Pa.1990), members of contractor associations claimed that they were discriminated against by the city's use of set-aside contracts. The court held that "the associations must show the injury suffered by their members with some specificity." *Id.* at 1283. In an attempt to establish standing, members of associations submitted affidavits setting forth their alleged injuries.

The court held that five contractor associations did not have standing to sue because their members' affidavits did not provide sufficient details of their injuries. *Id.* at 1284. The members of these associations only asserted that they would "generally" bid on the types of projects that were set-aside. *Id.* This conjecture, the court held, was "too speculative to meet the injury in fact requirement." *Id.*

Members of other associations submitted affidavits in which they asserted that they had bid on certain contracts. *See* 735 F.Supp. at 1283 n. 3. Those members had made affirmative, concrete steps to bid on specific contracts and thus had standing to challenge set-aside contracts. *Id.* at 1283.

■ Here, Road Builders allegations of injury are just as weak as the plaintiff associations in *Warth* and *Contractors Association*. Road Builders complaint alleges that defendants' use of set-asides "have adversely affected and/or will in the future adversely affect the ability of such Plaintiffs to bid on, compete for, and be awarded public work contracts of the Department of Transportation." Pl. Third Amended Complaint, ¶ 16. This is a constitutionally inadequate allegation of standing.

■ Road Builders not only has failed to establish the injury-to-its-members prong of the associational standing test, but has also failed the associational purpose prong. The interests Road Builders seeks to protect do not appear to be germane to the association's purposes. Article II of the Road Builders' Constitution and By–Laws lists the "specific purposes" of the association. The second specific purpose states that Road Builders will "conduct only those activities which are for the common good and benefit alike *for all members.*" Pl. Exh. 15 (emphasis added).

Road Builders' executive director testified that "probably a half a dozen" members of the association are certified as DBEs. Tr. at 49. The conduct of this lawsuit by Road Builders could hardly be held for the common good and benefit of *all* members of the association. If the suit should be successful, Road Builders members who are DBEs would have to compete among all contractors for projects that previously were limited to fellow DBEs. Consequently, Road Builders has failed to meet two prongs of the *Hunt* test and thus may not establish associational standing.

■ Road Builders argues that defendants are collaterally estopped from raising standing because in a prior case between Road Builders and the State, the courts were untroubled by the standing issue. *See Michigan Road Builders v. Milliken*, 834 F.2d 583 (6th Cir.1987), *aff'd*, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). The principle of collateral estoppel only applies if the issues presented in both cases are "substantially the same." *Cutler v. Hayes*, 818 F.2d 879, 889 (D.C.Cir. 1987). Since standing was never discussed in the earlier Road Builders case, the issues were not substantially the same as the present case. Further, the earlier Road Builders suit concerned a state set-aside program. Therefore, plaintiffs collateral estoppel argument is without merit.

Road Builders cannot claim to be caught unaware by the standing issue. Defendants argued the issue in their trial brief, citing many of the cases relied upon in this opinion. Def.Trial Br. at 43–45. Defen-

dants moved for directed verdict based upon lack of standing when plaintiffs closed their case. Tr. at 119–123. In "rebuttal," plaintiffs presented Goff in an attempt to establish standing. Tr. at 311–314. In defendants' post-trial brief, standing was again argued. Pl.Post-trial Br. at 29–33. Finally, the issue was once again raised at post-trial closing arguments. Closing Argument Tr. at 360–67.

Plaintiffs have failed to carry their burden of establishing standing. The member of Road Builders who, but for his race and sex, would be qualified to be a DBE and available for a specific project, might be "out there." But plaintiffs simply have not brought that contractor to the court's attention.

### D. Constitutionality

Even if plaintiffs had established standing, defendants have not acted unconstitutionally. Plaintiffs present two basic arguments. First, plaintiffs contend that defendants are using the federal authorization statute, STURAA, as a pretext for unconstitutional discrimination. Second, plaintiffs argue that defendants are unconstitutionally implementing STURAA by their use of set-asides. In order to utilize set-asides, plaintiffs argue, defendants must make prior findings of discrimination in Michigan.

Plaintiffs first contend that defendants are merely using STURAA as a means to unconstitutionally continue a set-aside system that was struck down by the Sixth Circuit in 1987, a ruling subsequently affirmed by the Supreme Court in 1989. Plaintiffs refer to *Michigan Road Builders Association, Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987), *aff'd*, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989) ("*Road Builders I*").

The present case is different from *Road Builders I*. *Road Builders I* concerned a state set-aside program for construction projects containing only state, not federal, funds. As the twelfth finding of fact indicates, plaintiffs in this action are only challenging highway contracts containing federal funds. Contracts containing solely state funds are no longer a part of the set-aside program, in accordance with *Road Builders I*. Thus, *Road Builders I* is essentially irrelevant to the issues presently before the court.

As to plaintiffs second argument concerning defendants' implementation of STURAA, the key question is whether the analysis will be under *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) or *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Fullilove*, the Supreme Court rejected a facial challenge to the constitutionality of a federal affirmative action statute requiring that 10% of federal funds granted for local public works projects be used to procure services or supplies from minority businesses.

In *Croson*, the Court struck down a city minority business set-aside program enacted for the purpose of promoting participation by minority business enterprises in the construction of public projects. In *Croson*, the city failed to support its program with past findings of discrimination, just as the state of Michigan failed to support its set-aside program in *Road Builders I*.

██ The overriding distinction between the federal program held constitutional in *Fullilove* and the state and city programs held unconstitutional in *Croson* and *Road Builders I* is Congress' hand in the *Fullilove* program, and conversely, Congress' lack of involvement in *Croson* and *Road Builders I*. In *Fullilove*, the Supreme Court emphasized Congress' power to "provide for the general Welfare of the United States" and "to enforce, by appropriate legislation," the equal protection guarantee of the Fourteenth Amendment. U.S. Const. art. I, § 8, cl. 1; U.S. Const. amend. XIV, § 5; *Fullilove*, 448 U.S. at 472, 100 S.Ct. at 2771–72. Because of these powers, Congress "acted within its competence" in imposing an affirmative action program to remedy nationwide discrimination in the construction industry. *Id.* at 478, 100 S.Ct. at 2774–75.

Last term, the Supreme Court addressed whether minority preference policies of the

Federal Communications Commission were a violation of equal protection. *Metro Broadcasting, Inc. v. Federal Communications Commission,* — U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). The Court found it of "overriding significance" that the minority programs were "specifically approved—indeed, mandated—by Congress." 110 S.Ct. at 3008. The Supreme Court extensively cited *Fullilove* as precedent for its decision in *Metro Broadcasting. See* 110 S.Ct. at 3008–3009.

In *Croson,* Justice O'Connor, in a section of her opinion joined by Justices Rehnquist and White, distinguished *Croson* from *Fullilove.* Justice O'Connor quoted from Chief Justice Burger's opinion in *Fullilove.* " 'Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional anti-discrimination provisions, but also, where Congress has authority to *declare certain conduct unlawful,* it may, as here, authorize and induce state action to avoid such conduct.' " *Id.* 448 U.S. at 488, 100 S.Ct. at 2780 (quoting *Fullilove,* 448 U.S. at 483–84, 100 S.Ct. at 2777 (opinion of Burger, C.J.)) (emphasis added by O'Connor, J.). Furthermore, Justice O'Connor stressed that Congress "could mandate state and local government compliance with the setaside program" at issue in *Fullilove. Id.* at 487, 100 S.Ct. at 2779.

"The joint lesson of *Fullilove* and *Croson* is that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. And one way it can do that is by authorizing states to do things that [states] could not do without federal authorization." *Milwaukee County Pavers Association v. Fiedler,* 922 F.2d 419, 423–24 (7th Cir.1991) (Posner, J.).

STURAA is very similar to the program upheld in *Fullilove.* In the statute at issue in *Fullilove,* as in STURAA, Congress relied on an administrative agency to flesh out the implementation of the statute consistent with Congress' intentions and objectives. *See Fullilove,* 448 U.S. at 468, 100 S.Ct. at 2769–70. The Supreme Court held

that the *Fullilove* program was constitutional on its face. Here, plaintiffs concede that STURAA and the federal regulations applying it are constitutional.

■ At issue in the present case, then, is a state agency's implementation of a Congressionally authorized federal program. No relevant authority—not STURAA itself, not the federal regulations, not *Fullilove,* and not *Croson* —requires the state recipient of federal funds to conduct any inquiry to determine the existence of prior discrimination in the state construction industry in implementing STURAA. Instead, the federal regulations direct the state recipient to follow a number of steps to determine an appropriate goal. The state has followed those steps and plaintiffs do not object to the outcome defendants reached in following the steps.

In *Milwaukee Pavers,* plaintiffs made a nearly identical challenge to state implementation of STURAA as plaintiffs make here. Plaintiffs in both cases conceded the constitutionality of STURAA and the implementing regulations. In *Milwaukee Pavers,* Judge Posner, writing for a unanimous Seventh Circuit panel, asserted, "Insofar as the state is merely doing what the statute and regulations permit, the attack on the state is an impermissible collateral attack on the statute and regulations." 922 F.2d at 424. Plaintiffs' position that state implementation of STURAA must be accompanied by a state determination of prior discrimination has been rejected by every federal court that has considered the issue. *See Milwaukee County Pavers Association v. Fiedler,* 922 F.2d 419 (7th Cir.1991); *Tennessee Asphalt Co. v. Farris,* No. 3-85–1176, slip op. (M.D.Tenn. June 14, 1990), *app. pending,* No. 90–5945 (6th Cir.); *Ellis v. Skinner,* 753 F.Supp. 329 (D.Utah 1990); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 743 F.Supp. 977 (N.D. N.Y.1990).

■ Plaintiffs argue that STURAA and the federal regulations only allow the states to establish a strict 10% goal. This assertion is directly contradicted by the plain language of STURAA, which states that "not less than" 10% of the funds ap-

propriated across the country shall be awarded to DBEs. The regulations also belie plaintiffs' argument by clearly allowing a state recipient of federal funds to set a goal of more than 10%. *See* 49 C.F.R. § 23.64(d).[3]

Consequently, plaintiffs' argument ultimately rests on the constitutionality of defendants' use of 1.32% set-asides to reach the federally-approved 15% goal. The regulations, by their plain language, allow for the use of set-asides. 49 C.F.R. § 23.45(k). Two criteria must be met before a state institutes set-asides. First, the state must determine that set-asides are necessary to meet its goals. The state has made that determination in this case and the federal government has approved the state's determination. Second, the use of set-asides must not be prohibited by state or local law. *Id.*

■ Defendants argue that this court does not have jurisdiction to rule on whether state law prohibits set-asides, under the doctrine set forth in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1983). The court disagrees. The court has jurisdiction to decide whether defendants' compliance with the federal regulations is constitutional. Those regulations explicitly direct that the set-aside provision is not to be utilized if state law forbids such a practice. *Cf. Jerome v. United States,* 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640 (1943) (Congress may enact a statute making the application of federal law dependent on state law). Thus, in order to determine if defendants are adhering to the federal regulations, the court must inquire whether state law forbids set-asides.

■ Plaintiffs further argue that the Michigan Constitution prohibits set-asides. The Michigan Constitution provides:

Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin. The legislature shall implement this section by appropriate legislation.

Mich. Const. art. I, § 2.

The first clause, dealing with equal protection, has been held to be identical to the Fourteenth Amendment of the United States Constitution. *People v. Walker,* 135 Mich.App. 267, 354 N.W.2d 312 (1984), *app. dismissed,* 474 U.S. 801, 106 S.Ct. 32, 88 L.Ed.2d 26 (1985). As *Fullilove* and *Metro Broadcasting* teach, the limited use of affirmative action when authorized by a federal statute does not violate the Fourteenth Amendment.

The Michigan legislature is directed in section 2 to implement the section's provisions. Thus, if the legislature passed a statute that banned the use of set-asides in Michigan, the use of set-asides would be prohibited in Michigan. Were this the case, defendants would not be able to utilize set-asides under 49 C.F.R. § 23.45(k). However, plaintiffs have not cited any Michigan statute that bars the use of set-asides.

Similarly, plaintiffs have not cited any Michigan state court decision that has struck down set-asides based upon section 2 of the Michigan Constitution. This court will not interpret the Michigan Constitution as prohibiting set-asides without any indication that Michigan state courts or the Michigan legislature would interpret the state constitution in such a manner. Therefore, the court holds that the state's use of set-asides is not prohibited by state law.

### III. Conclusion

Plaintiffs failed to clearly and specifically establish standing. Plaintiffs presented an abstract case of discrimination and the court is powerless to embellish plaintiffs' allegations. Even if plaintiffs had established standing, there was no showing that defendants did anything but conscientiously follow an undisputedly constitutional federal statute. Thus, defendants have acted constitutionally. Plaintiffs' claims

---

**3.** Plaintiffs' argument is puzzling because counsel informed the court that he had "no problem" with the state setting a goal above 10%. Closing Argument of plaintiffs' counsel, Tr. at 338.

for declaratory and injunctive relief are denied.

## JUDGMENT

This action having been tried to the court, and the court having filed its findings of fact and conclusions of law;

IT IS HEREBY ORDERED that defendants Department of Transportation of the State of Michigan and the Michigan State Transportation Commission are DISMISSED under the Eleventh Amendment;

IT IS FURTHER ORDERED that defendant James J. Blanchard is DISMISSED for plaintiffs' failure to state a claim against him;

IT IS FURTHER ORDERED AND ADJUDGED that, as to the remaining defendants, plaintiffs take nothing on their complaint for declaratory and injunctive relief and that judgment is entered on behalf of defendants on all claims.